# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 18, 2010 Session

## CK DEVELOPMENT, LLC v. TOWN OF NOLENSVILLE, ET AL.

### Appeal from the Chancery Court for Williamson County
### No. 37182      Robbie T. Beal, Judge

---

### No. M2010-00633-COA-R3-CV - Filed January 6, 2012

---

The Developer of a Planned Unit Development in Nolensville sought final approval from the planning commission of phase 7 of the development. The planning commission conditioned its approval of the plan on the developer's agreement to construct the roads in phase 7 in accordance with more recent road standards that were adopted in 2007. The developer filed a petition for writ of certiorari claiming it had vested rights in the earlier road standards and that complying with the more rigorous standards would require it to spend more money than it had originally planned. The trial court agreed with the developer and concluded that it had vested rights in the earlier road standards. The town appealed. We reverse the trial court's decision because the developer did not rely on any final governmental approval, the application of the improved road standards was not a zoning change, and the developer has neither engaged in substantial construction of phase 7 nor incurred substantial liabilities with respect to phase 7. We also reject the developer's argument that the planning commission exceeded its jurisdiction by acting in a legislative rather than an administrative capacity when it determined the developer was required to comply with the 2007 road standards.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

William N. Bates, Nashville, Tennessee, for the appellants, Town of Nolensville, Tennessee and Town of Nolensville Planning Commission.

James L. Murphy, Patricia Head Moskal, Jeffrey L. Allen, Nashville, Tennessee, for the appellee, CK Development, LLC.

## OPINION

### I. INTRODUCTION

CK Development, LLC is the developer of a mixed-use real estate development known as the Bent Creek Planned Unit Development ("Bent Creek PUD") in Nolensville, Tennessee. CK Development has developed the PUD in phases over the years, and until 2009 the roads throughout the PUD were built according to the town's 2003 Road Standards. When CK Development submitted the PUD plan for Phase 7, the Town Planning Commission ("Planning Commission") informed CK Development that the roads within Phase 7 would have to be built in compliance with the Town's 2007 Road Standards rather than the 2003 Road Standards. CK Development filed a petition for common law writ of certiorari in the Chancery Court in Williamson County, claiming the Planning Commission was imposing an arbitrary and unlawful condition by requiring CK Development to build the roads in Phase 7 in compliance with the 2007 Road Standards.

The trial court held the Planning Commission could not impose the 2007 Road Standards on Phase 7 of the Bent Creek PUD because CK Development had vested rights in the 2003 Road Standards. The Town of Nolensville appealed.

### II. BACKGROUND

### A. Nolensville Zoning Ordinance Requirements for PUD Developments

The Town of Nolensville Zoning Ordinance (the "Zoning Ordinance") sets forth the steps a PUD developer must follow before it will be issued a building permit.[1] The Zoning Ordinance clearly states that a PUD "may only be constructed subject to the standards and procedures as outlined [herein]." Zoning Ordinance §2.2.10.B. The first step an applicant must take is to submit a Concept Plan for the Planning Commission to consider. The Concept Plan is a general plan. The Planning Commission has discretion to approve or reject the Concept Plan, and if approved, the commission recommends approval of the plan to the Town's Board of Mayor and Aldermen ("BOMA"). Zoning Ordinance §§2.2.10.B.1.b, c, 2.a.

---

[1]The Nolensville Planning Commission has defined a PUD as follows:

A land tract in which a multiplicity of land uses may be permitted, designed to facilitate the flexible techniques of land development and site design by providing relief from zone requirements for conventional developments. It requires approval of a master, or Concept Plan, and usually promotes common objectives similar to cluster developments. Rezoning is required since the PUD is an overlay district placed over an existing base zone.

Once the Planning Commission recommends approval of the Concept Plan to the BOMA, the BOMA has discretion to approve the Concept Plan, approve the request with conditions, or reject the Concept Plan. Zoning Ordinance §2.2.10.B.1.d. Once the BOMA approves the Concept Plan, the applicant is required to submit a final plan for the Planning Commission's consideration. If the PUD involves division of existing parcels, the applicant must also submit a preliminary subdivision plan for approval. Zoning Ordinance §2.2.10.B.1.e.

Before a building permit can be issued for any construction to begin in any subdivision of the PUD, the Planning Commission must approve each final subdivision plan. Zoning Ordinance §2.2.10.B.1.e. The Zoning Ordinance specifies that once the BOMA has approved the Concept Plan, the applicant has one year within which to apply for approval of the final PUD plan or subdivision plans. If the applicant fails to apply for approval of a final plan within one year after the Concept Plan is approved, the BOMA's approval of the Concept Plan automatically expires. Zoning Ordinance §2.2.10.B.3. The terms, conditions, and the final PUD plan may be amended, but only by official action of the Planning Commission. Zoning Ordinance §2.2.10.B.4.

**B. Phases 1-6 of the Bent Creek PUD**

In December 2003, CK Development first submitted a Concept Plan to the Town of Nolensville Planning Commission to develop the Bent Creek PUD. CK Development proposed to develop 757 single family homes, 49 multi-family units, and about 260,000 square feet of commercial space. The Concept Plan noted that the roadway materials would be governed by the road specifications adopted on August 14, 2003. On January 15, 2004, the Planning Commission approved the Concept Plan subject to certain conditions. The relevant conditions included the following:

13. The Nolensville Planning Commission may review all of the conditions (1-16) and adjust conditions as necessary.

. . . . .

15. Since a PUD is flexible, the Nolensville Planning Commission can review the PUD at each phase of the PUD.

Through Ordinance No. 04-03, the Bent Creek PUD Concept Plan was introduced on first reading for consideration and approval by the BOMA. A public hearing was conducted, and on May 6, 2004, the BOMA unanimously adopted Ordinance 04-03, providing that the Bent Creek PUD would be applied as a zoning overlay to the property and that the Concept

-3-

Plan was approved subject to the conditions recommended by the Planning Commission. The ordinance stated:

> **NOW THEREFORE, BE IT ORDAINED, THAT THE ZONING MAP OF THE TOWN OF NOLENSVILLE, TENNESSEE be amended as follows:**
>
>> That the Planned Unit Development Overlay, known as the Bent Creek Planned Unit Development be applied to the property located between Clovercroft Road and Sam Donald Road and identified as Map 59, Parcel 25.0.1 on the tax map for Williamson County, Tennessee and that the Concept Plan as described in the minutes of the March 11, 2004 Nolensville Planning Commission meeting be approved **subject to conditions as contained in said minutes** as recommended by the Nolensville Planning Commission to the Board of Mayor and Aldermen. (Emphasis added.)

As required by the Town's Zoning Ordinance, CK Development submitted a final PUD plan for each phase of development to the Planning Commission for approval. The Planning Commission approved the final PUD plan and the seven subdivision plats submitted for Phase 1 on August 12, 2004. Phase 1 included 166 lots and 6,786 feet of new roads. The roads for Phase 1 were completed in 2006 and 2007.

The Planning Commission approved the final PUD plan for Phase 2 the following year, on July 14, 2005. Phase 2 includes 117 lots and 5,188 feet of new roads. The record suggests that a majority of these roads were constructed in 2007 and 2008, but that 1,953 feet of these roads have not yet been laid down.

The Planning Commission approved the final PUD plan and subdivision plat for Phase 3 on November 10, 2005. Phase 3 contains thirty-six lots and will include 1,200 feet of new roads. It is not clear from the record whether construction of these roads has begun.

The Planning Commission approved the final PUD plan and one of two subdivision plats for Phase 4 on June 12, 2007. Phase 4 is to include two subdivisions, but only the second subdivision plat containing thirty-two lots has been approved by the Planning Commission. Phase 4 will include 1,895 feet of new roads, and the record does not indicate whether construction on these roads has begun.

The Planning Commission approved the final PUD plan and two subdivision plats for

Phase 5 on March 9, 2006. Phase 5 includes two subdivisions and contains eighty-two lots. Phase 5 will include 3,691 feet of new roads, and the record does not indicate whether construction on these roads has begun.

The Planning Commission approved the final PUD plan for Phase 6 on May 8, 2007, but the record does not indicate whether a final subdivision plat has been submitted to the Planning Commission for Phase 6. Phase 6 is to contain 62 lots, and it is not clear from the record how many feet of roads will be constructed to serve Phase 6.

### C. Planning Commission Approves Revision of Roadway Standards

On November 13, 2007, the Planning Commission approved an amendment to the town's Subdivision Regulations to revise the Local Roadway-Typical Section to increase the required asphaltic concrete base prime coat from 2 inches to 3 inches and increase the required asphaltic concrete surface tack coat from 1 1/2 inches to 2 inches.

### D. Phase 7 of the Bent Creek PUD

In September 2009, CK Development submitted the final PUD plan for Phase 7 to the Planning Commission. Phase 7 proposed the creation of 33 new lots. The Planning Commission met on October 13, 2009, to consider the final plan, and recommended approving the plan subject to certain conditions. The only condition relevant to this appeal is the following:

> The road standards that are currently in effect will be adhered to, as recommended by staff.

The change in road standards required CK Development to add an extra inch of asphaltic concrete base prime coat and an extra ½ inch of asphaltic concrete surface tack coat to the roads in Phase 7.

There was considerable discussion between CK Development and Town officials regarding the reasons for the Planning Commission's decision to increase the required pavement thickness for its subdivisions in general and the need for the improved road standards to apply to the roads in Phase 7 in particular. The Town engineer explained that one of the reasons the Town decided to adopt regulations increasing the cross section for residential subdivision streets in 2007 was that the prior standards governing roads' cross sections had proved to be inadequate, leading to failures of the roadways. The Town engineer added that the Town would probably continue to experience problems with the older roads built to the former standards. In an effort to reduce the number of road failures, the

Town decided to adopt new road standards beefing up the cross section of subdivision roads to include a deeper binder and asphalt surface. Road standards for developments or subdivisions are important to a municipality because, after the development is finished, the municipality accepts the roads and takes responsibility for their maintenance.

In response to CK Development's argument that it believed the Planning Commission's initial approval of the PUD in 2003 meant that subsequently adopted regulations would not be applied to the Bent Creek PUD, the Mayor said:

[T]he whole emphasis of a planned unit development, and it's approved on the basis that you continually come up in different phases for approval when in, you know, we're going to have some planned unit developments that are going to develop out several many years. You can't – we know more, we do better and we see issues with our roads, as the time marches on, for public safety and public good, we increase our road standards. It seems ridiculous that something like ten years, fifteen years from now, you're going to hold to a road standard from how many years ago.

The Concept Plan approved by the Planning Commission in August 2003 included a Note that read: "For Roadway Materials see specifications per Town of Nolensville Subdivision Regulations; adopted 8/14/03." CK Development asserts that the increased cost of constructing the roads in Phase 7 in compliance with the 2007 Road Standards would be $24,428, or $740 per lot.[2]

Objecting to the Planning Commission's condition that it comply with the 2007 Road Standards for Phase 7 of the Bent Creek PUD, CK Development filed a petition for writ of certiorari in the Williamson County Chancery Court. CK Development argued the Planning Commission exceeded its jurisdiction, and/or acted illegally, capriciously, or arbitrarily in requiring the roads within Phase 7 be constructed in compliance with the 2007 Roadway Standards because the standards for construction of all roads in the Bent Creek PUD had been established as part of the zoning for the PUD when the Concept Plan was approved by the BOMA in May 2004. CK Development also claimed the Planning Commission lacked the authority to modify the zoning for the PUD by requiring CK Development to utilize a road standard different from the road standards approved by the BOMA. CK Development additionally argued it has a vested right to develop the roads throughout the Bent Creek PUD in accordance with the road standards described in the Concept Plan based on the substantial

_____

[2]CK Development estimates that the total increased cost to construct the rest of the roads in the Bent Creek PUD, consisting of 62 lots in Phase 6, 33 lots in Phase 7, and 230 lots for the remaining phases, would be about $240,000.

construction of the roads thus far in the PUD.

### III. TRIAL COURT PROCEEDINGS

The trial court issued a fiat and writ of certiorari in December 2009 and conducted a hearing on the merits in February 2010. At the end of the hearing, the court stated the following from the bench:

I don't believe that just because a PUD Concept Plan is adopted and finalized, that it creates such zoning conditions that only the BOMA can change. I don't believe that that is - - I don't believe that the Planning Commission has exceeded its jurisdiction in doing that. . . . The Court - - my court, at least - - doesn't believe that those Concept Plans are of such a nature that they become zoning conditions that require action by the legislative body in which to change. That's the whole purpose of having the conditions present on most of these. So the Court doesn't accept that argument.

. . . . .

I think the biggest issue here is whether CK Development has vested rights that have attached in developing this property, whether they've made such a commitment that it would be basically unfair to CK to change the rules midstream.

The Court does believe that we're in a bit of a different situation than what is normally considered pre-planning costs. . . . In this case I think CK Development has gone quite a bit farther than that. They didn't just have pre-planning costs here. They have based their subdivision profitability upon the roads costing a certain amount to build, and the Court is very sympathetic to the fact that they've built out the subdivision with an eye on that cost, and now to change increases that cost and may, in fact, make the remainder of the lots unaffordable for the type of subdivision that's been built. So that is - - again, the Court is sympathetic to that. I don't believe that it's pre-planning costs, and I think there is certainly an argument for detrimental reliance based upon their initial planning of the subdivision.

The trial court issued an Order on February 26, 2010 in which it ruled:

1. This matter is properly before this Court pursuant to the common law writ of certiorari.

-7-

2.    The Planning Commission had the authority to change matters shown on the Concept Plan that had been adopted by the Board of Mayor and Aldermen of the Town of Nolensville pursuant to Ordinance 04-03.

3.    There was material evidence presented to the Planning Commission regarding the need to apply the 2007 Road Standards for the construction of the roads in Phase 7 of the Bent Creek PUD.

4.    The Planning Commission did not act in an arbitrary or capricious manner.

5.    The developer had vested rights significant enough to rely upon the original PUD plan approval that a change in the roads would jeopardize the project financially.

## IV. ISSUES ON APPEAL

The Town of Nolensville filed a notice of appeal and argues the trial court erred in ruling CK Development had vested rights in the 2003 Subdivision Regulations as they applied to Phase 7 of the Bent Creek PUD because (1) there was no unconditional right to have the 2003 Roadway Standards applied to Phase 7 of the Bent Creek PUD, and (2) CK Development had neither begun substantial construction on Phase 7 nor incurred substantial liabilities with respect to Phase 7 when the Planning Commission determined that the roads in Phase 7 were required to be constructed in compliance with the 2007 Road Standards. The Town also argues the Planning Commission did not exceed its jurisdiction in requiring the Bent Creek PUD to adhere to the Road Standards as amended and updated in November 2007.

## V. STANDARD OF REVIEW

Where the local governmental action being challenged is administrative or quasi-judicial in nature, rather than legislative in nature, the appropriate method for obtaining judicial review of that action is by common law writ of certiorari. Tenn. Code Ann. § 27-8-101 (providing that the writ may be granted where an inferior tribunal, board, or officer exercises judicial functions); *McCallen v. City of Memphis*, 786 S.W.2d 633, 640 (Tenn. 1990). The test for determining whether the governmental action is legislative or administrative is whether it "makes new law or executes one already in existence." *Id*. at 639. The decision of whether to grant a building permit, for example, is an administrative act, even if made by a legislative body. *Id*. The terms "quasi-judicial" and "administrative"

are interchangeable in this context. *Id*. at 638; *Weaver v. Knox County Bd. of Zoning Appeals*, 122 S.W.3d 781, 784 (Tenn. Ct. App. 2003).

Deciding whether a particular situation meets the requirements of an existing ordinance is an administrative function. *McCallen*, 786 S.W.2d at 640 (citing *Mullins v. City of Knoxville*, 665 S.W.2d 393, 396 (Tenn. Ct. App. 1983)); *Hutcherson v. Lauderdale County Bd. of Zoning Appeals*, 121 S.W.3d 372, 376 (Tenn. Ct. App. 2003). A decision to issue or not to issue a building permit is an administrative decision, whether made by an official or a board. *Thompson v. Metropolitan Government of Nashville and Davidson County*, 20 S.W.3d 654, 659 (Tenn. Ct. App. 1999); *Harrell v. Hamblen County Quarterly Court*, 526 S.W.2d 505, 509 (Tenn. Ct. App. 1975).

The decision by the Planning Commission in the case before us involves the same type of situation: essentially denying approval of Phase 7 unless the roads in that phase conformed to standards in effect at the time of consideration. Accordingly, the Commission's decision is properly reviewed by the common law writ of certiorari.

Under the limited standard of review in common law writ of certiorari proceedings, courts review a lower tribunal's decision only to determine whether that decision maker exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision. *Petition of Gant*, 937 S.W.2d 842, 844-45 (Tenn. 1996) (quoting *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990)); *Fallin v. Knox County Bd. of Com'rs*, 656 S.W.2d 338, 342-43 (Tenn. 1983); *Hoover Motor Exp. Co. v. Railroad & Pub. Util. Comm'n.*, 261 S.W.2d 233, 238 (Tenn. 1953); *Lafferty v. City of Winchester*, 46 S.W.3d 752, 758-59 (Tenn. Ct. App. 2001); *Hoover, Inc. v. Metro. Bd. of Zoning Appeals,* 955 S.W.2d 52, 54 (Tenn. Ct. App. 1997); *Hemontolor v. Wilson Co. Bd. of Zoning Appeals*, 883 S.W.2d 613, 616 (Tenn. Ct. App. 1994).

Under the certiorari standard, courts may not (1) inquire into the intrinsic correctness of the lower tribunal's decision, *Arnold v. Tennessee Bd. of Paroles*, 956 S.W.2d 478, 480 (Tenn. 1997); *Powell v. Parole Eligibility Rev. Bd.*, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994); (2) reweigh the evidence, *Watts v. Civil Serv. Bd. for Colum.*, 606 S.W.2d 274, 277 (Tenn. 1980); *Hoover, Inc. v. Metro Bd. of Zoning App.*, 924 S.W.2d 900, 904 (Tenn. Ct. App. 1996); or (3) substitute their judgment for that of the lower tribunal. *421 Corp. v. Metropolitan Gov't of Nashville*, 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000).

"[T]he court's primary resolve is to refrain from substituting its judgment for that of the local governmental body." *McCallen*, 786 S.W.2d at 641; *See Capps v. Metro. Gov't of Nashville and Davidson Cty.*, 2008 WL 5427972, at *5 (Tenn. Ct. App. Dec. 31, 2008) ("[i]n

recognition of the policy that favors permitting the community decision makers closest to the events to make the decision, the courts refrain from substituting their judgments for the broad discretionary power of the local governmental body").

## VI. THE ROAD STANDARDS

The Planning Commission clearly had authority to adopt the 2007 Road Standards. Although Planned Unit Development is a zoning classification, a development such as the one herein also involves subdivision. Tennessee Code Annotated § 13-4-301(4)(B) defines subdivision as "the division of a tract or parcel of land into two (2) or more lots, sites, or other divisions requiring new street or utility construction, or any division of less than five (5) acres, for the purpose, whether immediate or future, of sale or building development, and includes resubdivision and when appropriate to the context, relates to the process of resubdividing or to the land or area subdivided."

State statutes provide local planning commissions the authority to adopt regulations regarding the subdivision of land. Tenn. Code Ann. § 13-4-303. In particular, the General Assembly has granted to municipal planning commissions the specific authority to include in such regulations "the extent to which and the manner in which streets shall be graded and improved." Tenn. Code Ann. §13-4-303(b). Pursuant to this statutory authority, the Nolensville Planning Commission amended its Subdivision Regulations on November 13, 2007, to improve the Local Roadway – Typical Section. This amendment resulted in the 2007 Road Standards at issue herein.

The subdivision statutes recognize the significance of road standards in subdivided property because the city will accept the roads as public roads and become responsible for their maintenance. *See, e.g.*, Tenn. Code Ann. § 13-4-307 (acceptance of streets). Tennessee Code Annotated § 13-4-308 establishes a requirement of road acceptance before building permits can be issued.

In the case before us, the issue is not whether the Planning Commission had the authority to **adopt** the 2007 improved Road Standards, but, instead, whether it could **require compliance** with those standards in phases of CK Development's project that were to be built, or whose final plans and subdivision plats were approved, after the adoption of the standards. The wording of the statutes giving planning commissions the authority to adopt road standards provides no implication that the standards cannot be applied to any future road construction in subdivisions. The adoption of new standards for improved roads, based on experience and to accommodate a city's evolving needs, serves the public interest.

-10-

However, CK Development challenges the application of the 2007 Road Standards to the unbuilt phase or phases of its planned development on various grounds. We begin with the challenge to the Planning Commission's actions as a change in zoning.

## VII. THE PLANNING COMMISSION DID NOT AMEND THE ZONING ORDINANCE, NOR DID IT ACT BEYOND ITS JURISDICTION OR ARBITRARILY IN APPLYING THE 2007 ROAD STANDARDS TO PHASE 7 OF THE PUD

Among other arguments underlying its challenge, CK Development argues that since a PUD district overlay is a type of zoning, any changes made to the PUD constitute a change in zoning and, therefore, must be made by the local legislative bodies. When the Planning Commission determined the roads in Phase 7 must be built in conformity with the 2007 Road Standards, CK Development argues, the Planning Commission exceeded its jurisdiction by acting in a legislative rather than in an administrative capacity.

While it is true that the authority to enact zoning and zoning changes is given exclusively to local legislative bodies, we do not agree that the Planning Commission's decision to require CK Development to comply with the 2007 Road Standards in developing Phase 7 as a condition for approval constituted "zoning."

Zoning has been defined by this court as:

[Z]oning involves the territorial division of land into districts according to the character of the land and buildings, their suitability for particular purposes, and the uniformity of these uses. Zoning regulations focus **primarily on the use of the property** and the architectural and structural designs of the buildings.

*Lafferty*, 46 S.W.3d at 758 (emphasis added) (citing *Family Golf of Nashville v. Metropolitan Gov't of Nashville*, 964 S.W.2d 254, 258 (Tenn. Ct. App. 1997)) and *In re Sundance Mountain Ranches*, 754 P.2d 1211, 1213 (N.M. Ct. App. 1988); *see In re Taft Corners Assoc.*, 758 A.2d 804, 807 (Vt. 2000) (purpose of zoning ordinances is to permit, prohibit, restrict, regulate, and determine land development); *City of Sanibel v. Buntrock*, 409 So.2d 1073, 1075 (Fla. Dist. Ct. App. 1982) (zoning ordinance substantially limits how owner can **use** land).

A municipality, county, or other unit of local government has no inherent power to enact zoning laws. Such power only exists by virtue of authority delegated by the State. *Smith County Planning Commission v. Hiwassee Village Mobile Home Park,* 304 S.W.3d

-11-

302, 309 (Tenn. 2010); *Edwards v. Allen*, 216 S.W.3d 278, 284 (Tenn. 2007); *421 Corp.*, 36 S.W.3d at 475.

Not every regulation that may affect private property is a zoning regulation. A municipality has the general authority to enact regulations concerning the health, safety, and welfare of a community pursuant to its police powers. *Cherokee Country Club v. City of Knoxville*, 152 S.W.3d 466, 471 (Tenn. 2004). Upon occasion, courts have been called upon to determine whether a particular legislative enactment or other action constitutes a zoning ordinance. This determination has been required in order to decide, for example, whether a party is entitled to protection of the grandfather statute which protects pre-existing uses from the effect of "zoning changes." Tenn. Code Ann. § 13-7-208. *See, e.g., Smyrna v. Bell*, No. M2010-01519-COA-R3CV, 2011 WL 5184117 (Tenn. Ct. App., Oct. 31, 2011).

In *Cherokee Country Club v. City of Knoxville*, the Tennessee Supreme Court was called upon to determine whether an emergency demolition ordinance adopted by the city council was "a zoning ordinance or a building regulation." 152 S.W.3d at 471. The emergency ordinance had been adopted without compliance with statutory requirements of notice and public hearings that apply to zoning enactments. The city argued that the emergency ordinance was not a zoning ordinance, but was, instead, a building regulation that did not require notice, hearing, etc. *Id*. at 470. The Court's determination of whether the ordinance was a zoning ordinance would resolve the question of its validity.

The court noted that other jurisdictions had had to face the question of how to distinguish a zoning act from other regulations and had come up with a variety of approaches to that question. The Court concluded that the most well-reasoned and persuasive approach, and the approach it specifically adopted, is to determine whether a regulation or ordinance **"substantially affects the property owners' use of land."** 152 S.W.3d at 473 (emphasis added). If it does, then it should be recognized and treated as a zoning regulation or ordinance. *Id.*

"Whether a substantial interference with the use of the land exists is largely a case by case determination." *Cherokee County Club*, 152 S.W.3d at 472. In *Cherokee Country Club*, the Court examined several opinions from other jurisdictions applying the "substantial interference" standard. *Id*. at 472-73. In cases finding substantial interference, the enforcement of the measures at issue would have largely destroyed the landowner's ability to use his or her property.

Applying the "substantially interferes" analysis in *Cherokee Country Club*, the Court found that the emergency demolition ordinance, which prohibited the issuance of demolition permits for any property under consideration for inclusion in a historic district, was a zoning regulation that had not been enacted pursuant to statutory requirements of planning, notice, and hearing. *Id*. at 474. "Although not every regulation relating to demolition is a matter of zoning, the broad and permanent restrictions in this ordinance substantially affected Cherokee's use of its property" and could permanently bar the landowner from using its own property for a purpose that was permitted under its current zoning classification. *Id*.

The Court also held that its conclusion under the facts of that case was consistent with the language of the zoning statutes, specifically the statute that grants to municipalities the power to regulate "the uses of buildings, structures and land for trade, industry, residence, recreation, public activities and other purposes." *Cherokee Country Club*, 153 S.W.3d at 474 (quoting Tenn. Code Ann. § 13-7-201(a)(1)).

The Tennessee Supreme Court later applied the "substantially affected" or "substantially interfered with" test set out in *Cherokee Country Club* to determine whether an amendment to a county zoning map was a zoning ordinance requiring compliance with the statutory requirements for zoning actions. *Edwards v. Allen*, 216 S.W.3d 278 (Tenn. 2007). The court held that "the request to allow a for-profit shooting range on property zoned as Residential 20 for single family dwellings 'substantially affects' the use of the land" and, therefore, the procedural requirements of Tenn. Code Ann. § 13-7-105 applied. 216 S.W.3d at 286.

In *B.F. Nashville, Inc. v. City of Franklin*, No. M2003-00180-COA-R3-CV, 2005 WL 127082 (Tenn. Ct. App. Jan. 21, 2005), this court applied the *Cherokee Country Club* test to determine whether the protections of the grandfather statute, Tenn. Code Ann. § 13-7-208, applied. That answer was dependent on whether the enactment in question was a "zoning change," since those protections were available only where there had been a zoning change. 2005 WL 127082, at *2-3. We held that "an ordinance regulating the number, location, and size of advertising signs on property used for commercial purposes does substantially affect the property owner's use of the property." *Id*., at *13. In that case, based on the facts in the record, we determined that the business's inability to reconstruct an advertising sign visible to motorists on the interstate would substantially affect its use of the property. Consequently, the enactment or application of the sign ordinance to the particular property in question was a zoning change. *Id*.

In the case before us, CK Development's right to use its property to develop a residential or mixed-use development in the Bent Creek PUD is not substantially affected by the Planning Commission's requirement that it comply with the 2007 Road Standards. The permitted uses of the land have not changed in any way, and the 2007 Road Standards do not contain any provisions that limit CK Development's use for the purposes it intended.[3] It can still build its development; none of the uses it intended has been prohibited. The improved road standards are akin to building regulations or amendments to building safety codes. We therefore conclude that application of the newer road standards to roads constructed after the adoption of those standards is not an act of zoning. Consequently, the Planning Commission did not act in a legislative role, not did it amend the zoning ordinance, by requiring compliance with the 2007 Road Standards as a condition of approval of Phase 7 of the development.

The Planning Commission had the authority to apply the 2007 Road Standards to roads built after their adoption, including roads to be built in future phases of CK Development's PUD. As discussed earlier, the Nolensville ordinance governing PUDs gives the Planning Commission authority to approve plats for future phases and to impose conditions on those phases. State statute also provides similar approval authority, providing that "no street . . . or other public way . . . shall be constructed or authorized in the municipality until and unless the location and extent thereof shall have been submitted to and approved by the planning commission." Tenn. Code Ann. § 13-4-104. Additionally, the "widening, narrowing, relocation, vacation, change in use, acceptance, acquisition, sale or lease of any street or public way" is subject to approval of the municipal planning commission. *Id*.; *see also* Tenn. Code Ann. § 13-4-302(a) (providing that no plat of subdivision shall be filed or recorded unless it is approved by the planning commission). The legislature has given local planning commissions the authority to promulgate regulations and recommend ordinances regarding infrastructure because:

> The provision of well-designed and properly constructed infrastructure within such development is vital to the health, safety, and welfare of the public utilizing said development and the community as a whole. These types of developments typically contain infrastructure that **may be dedicated to a governmental entity** . . . .

---

[3]While CK Development may assert that the financial impact of its having to comply with the 2007 Road Standards does place limitations on its ability to use the property as planned, that argument is not relevant to the "act of zoning" issue and is considered in the "vested rights" discussion later in this opinion.

-14-

Tenn. Code Ann. §13-4-310 (emphasis added).

Thus, the Planning Commission did not act outside its jurisdiction in adopting the improved road standards nor in requiring future phases of CK Development's PUD to comply with those standards. The PUD overlay for this development, as adopted by the BOMA, incorporated specified conditions, *i.e.*, those identified in Planning Commission minutes for the meeting resulting in the Commission's recommendation for approval. Those included the authority of the Planning Commission to review the PUD at each phase.

The Nolensville ordinance governing procedures for PUDs provides that once the BOMA approves the Concept Plan, the applicant is required to submit a final plan for the Planning Commission's consideration. If the PUD involves division of existing parcels, the applicant must also submit a preliminary subdivision plan for approval, which also is subject to review by the Planning Commission. Before a building permit can be issued for any construction to begin in any subdivision of the PUD, the Planning Commission must approve each final subdivision plan. As part of the review of Phase 7 plans, the Commission decided that the improved road standards should be applied to that phase.

The Commission's decision to require compliance with the 2007 Road Standards was not arbitrary. The Commission heard the reasons for the improved standards, the city's concerns regarding the older standards, and the reasons why the 2007 Standards should be applied to Phase 7. We agree with the trial court that the Planning Commission's action was within its jurisdiction and was not arbitrary or capricious.

## VIII. VESTED RIGHTS

CK Development's primary argument, and the basis of the trial court's decision, is that the 2007 Road Standards could not be applied to Phase 7 of the Bent Creek PUD because CK Development had a vested right in the 2003 Road Standards.

The vested rights principle is a Constitution-based limitation on government actions that interfere with a landowner's use of his or her land. "The concept of a vested right in a zoning, which has long been recognized in Tennessee, allows property owners, who have acquired the requisite 'vested' interest under an existing zone, to use and develop the property pursuant to said zone even if a subsequent zoning ordinance is enacted." *Westchester Co., LLC v. Metro. Gov't of Nashville and Davidson County*, 2005 WL 3487804, at *3 (Tenn. Ct. App. December 20, 2005).

-15-

A vested right is defined as a right which the law recognizes as having accrued to an individual by virtue of certain circumstances and that as a matter of constitutional law cannot be arbitrarily taken away from that individual. The law of vested rights balances, on one side, the competing interests of the individual's desire for lower development costs and certainty for investment purposes. On the other side rests the public's interest in controlling land-use and land-use planning [as exercised through the government's police power]. Vested rights is really a mechanism which draws a line between legislative flexibility and the power to regulate land use and a landowner's right to use, enjoy, and develop his property in a way that maximizes its value. In determining on what side of this line a development will be placed, the law of vested rights focuses upon the acquisition of real property rights which are sufficient to continue with development without interference from subsequently enacted regulations.

The vested rights doctrine attempts to provide certainty as to when a developer will be protected from any new government regulation. Courts have concluded that, at some point during development, a level of commitment is reached at which time it would be unfair to halt any further development. The doctrine developed from the law of nonconforming uses. The doctrine makes guarantees that developers may proceed with a project unaffected by government interference after a certain point in the development process. Of course property rights are not absolute, and a municipality must be able to enact new ordinances that affect landowners so as not to preclude development and fix a city forever in its primitive conditions. However, at some point it is necessary to give the developer assurance that the proposed project can continue without retroactive application of new zoning laws.

Kalachnik, Tyhler J., *Try to Vest, Try to Vest, Be our Guest: The Vested Rights Conflict in Indiana Creates a Unique Solution for All*, 39 IND. L. REV. 417, 421 (2006) (internal quotations and citations omitted).

Because the vested rights doctrine is based on due process principles, the party claiming a vested right must demonstrate a property interest that is sufficient to warrant its protection. "[T]he general majority rule is that a vested right exists when a building permit has been issued by the municipality, substantial construction or expenditures in reliance on the building permit are in evidence, and the landowner acted in good faith." 4 Am. Law Zoning §32:2 (5th ed.). Stated another way, "In order for a landowner to acquire vested

rights to develop, generally the 'landowner will be protected when: (1) relying in good faith, (2) upon some act or omission of the government, (3) he has made substantial changes or otherwise committed himself to his substantial disadvantage prior to a zoning change.'" Kalachnik, *supra*, at 422.

In the absence of a contrary statutory directive, the majority of states, including Tennessee, require issuance of a building permit, plus substantial construction and/or expenditures, before a right to develop vests. 4 Am. Law Zoning §32:3 (5th ed.). "[I]f a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit." *Avco Community Developers, Inc. v. South Coast Regional Commission*, 553 P.2d 546, 550 (Cal. 1976) (holding that developer had not acquired a vested right to develop property even though it had completed storm drains, street improvement, and utilities, incurring over $2 million in expenses plus liabilities, because the developer had not obtained a building permit).

Both parties rely on the same cases as establishing Tennessee law on vested rights of property owners, *i.e.*, *State of Tennessee, ex rel. SCA Chemical Waste Services v. Konigsberg*, 636 S.W.2d 430 (Tenn. 1982) and *Schneider v. Lazarov,* 390 S.W.2d 197 (Tenn. 1965). In *Konigsberg*, a company sought to build and operate a hazardous waste treatment plant. The city had adopted a new zoning ordinance, that was not yet effective, which would impose greater requirements on the plant. The city adopted a resolution that no permit be issued for such a plant until the effective date of the new requirements and compliance with the stricter requirements. After finding that the city's suspension of the issuance of permits pending the effective date of the new requirements was authorized, the Supreme Court held:

> Moreover, the relator is in no position to claim an estoppel or otherwise insist upon a vested right in the zoning regulations existing at the time it applied for the permit here sought; it had not begun construction nor even purchased the land upon which it proposed to build its plant. It is well settled that rights under an existing ordinance do not vest until substantial construction or substantial liabilities are incurred relating directly to construction. *Phillips Petroleum Co. v. City of Park Ridge*, 16 Ill.App.2d 555, 149 N.E.2d 344 (1958). *See,* 82 AM.JUR.2d *Zoning and Planning* 240 (1976) and cases there cited.

*Konigsberg*, 636 S.W.2d at 437.

To establish a vested right, most states require a showing of reliance by the landowner on prior zoning or governmental action. 4 Am. Law Zoning §32:4 (5th ed.). Such reliance must be reasonable. *Id*. When a landowner is aware of a pending change in zoning, that prior approval is subject to change, or that any approval given was preliminary, the landowner has not established justifiable or reasonable reliance. *Id*.; *Avco*, 553 P.2d at 550-557 (holding that although developer had made improvements necessary for subdivision, it had no vested right since it had not obtained a building permit); *see Bd. of Sup'rs of Stafford County v. Crucible, Inc*., 677 S.E.2d 283 (Va. 2009); *Lake Shore Associates v. Healy*, 861 N.E.2d 944 (Ill. 2006).

The type of government action that is generally required is the issuance of a building permit or other final approval.

> The majority or "late-vesting" rule, which provides that landowners will be protected when they have "reli[ed] in good faith upon an act or omission of the [] government by making a substantial expenditure[] or commitment[] prior to a change in the zoning law." The common law in the states following the majority rule requires the "issuance of a building permit," plus substantial construction or other action in reliance upon the permit in order for development rights to vest. **The most essential element of a vested rights claim in a majority state is the developer's acquisition and possession of a building permit.**

Kalachnik, *supra*, at 423 (internal citations and footnotes excluded) (emphasis added).

Even where a permit has been issued or other approval given, the landowner must have begun construction or incurred substantial liabilities or expenses directly related to construction before the change in zoning in order to claim a vested right to continue or begin construction under the pre-existing legal requirements. *Schneider v. Lazarov*, 390 S.W.2d at 201; *Konigsberg*, 636 S.W.2d at 437; *Westchester Co., LLC*, 2005 WL 3487804, at *3.

The holdings of *Westchester* are instructive. The Westchester Company owned property that was zoned for multi-family use and entered into a contract to sell its property to a third party for the development of multi-family town houses. *Westchester*, 2005 WL 3487804, at *1. After the contract was entered into, but before the property was sold, the local government changed the zoning classification from multi-family to single-family use. *Id*. The company was unable to consummate its agreement to sell the property once the zoning classification was changed, leading it to file a declaratory judgment action seeking

-18-

a judgment it had a vested right in the previous zoning classification. The company alleged it had vested rights in the prior zoning classification because the zoning change caused it to lose the profit it would have received under the contract. *Id.*

The trial court rejected the company's vested rights argument because there was no evidence of any substantial construction or substantial liability incurred directly relating to construction on the property. *Id.* at *2. The trial court noted that "[l]ost profits of any amount do not rise to the level of a vested right." *Id.* On appeal, the Court of Appeals agreed with the trial court. The company argued that its lost profits (amounting to more than $200,000) from the proposed sale of the property and the possibility of suit against it for breach of contract amounted to substantial liabilities. The Court of Appeals disagreed:

> It is well settled that rights under an existing ordinance do not vest until *substantial construction or substantial liabilities are incurred relating directly to construction*. . . . Westchester contends that its lost profits and/or its possibility of being sued for breach of contract amount to "substantial liabilities . . . relating directly to construction." We disagree. The plain language of the "substantial liabilities" concept contradicts such a conclusion. It is clear that the liability incurred must be, literally, directly related to *construction*. . . . Westchester's lost profits and potential liability on the contract to sell the property are not liabilities incurred in relation to *construction*. . . . We see no justification for the expansion of the well-defined concept of the activities required to permit the vesting of rights in a zoning classification. The purchase of property does not carry with it a guarantee that the zoning will not be changed.

*Id.* at *3-4 (emphasis in original) (citations omitted).

Additionally, any claimed liabilities and expenses must have been incurred in reasonable reliance on the governmental approval. Consequently, expenses or liabilities incurred prior to such approval or issuance do not qualify for purposes of determining whether a vested right exists. *Capps v. Metropolitan Government of Nashville and Davidson County*, No. M2007-010130COA-R3-CV, 2008 WL 5427972, at *11-12 (Tenn. Ct. App. Dec. 21, 2008) (holding that costs of demolition, surveys, and architectural plans incurred prior to the issuance of a challenged building permit were clearly not made in reliance on that permit, and therefore did not result in the vesting of rights under the permit). Similarly, expenses or liabilities incurred after notice of a challenge to a permit, or before time for appeal of the permit has expired, are not considered to have been made in good faith reliance

-19-

on the permit. *Id*. at *12.

In the *Capps* case, the landowner continued work on remodeling a building after she was notified of a challenge to her building permit. "Ms. Capps was aware that her permit was being challenged and subject to revocation." In that situation, expenses incurred during appeal of the permit would not be considered to have been incurred in good faith. *Id*. (quoting Juergensmeyer & Roberts, *Land Use Planning and Dev. Regulation Law* § 5.28 (2003)). In *Robertson Co. v. Browning-Ferris Industries of Tennessee, Inc.*, 799 S.W.2d 662 (Tenn. Ct. App. 1990), this court held that allowing a county to amend its zoning ordinance on remand would not deprive a disposal company of any vested rights in being allowed to develop a landfill because the company was fully aware that landfills would not be permitted under existing zoning(even though that zoning was declared invalid in this appeal), but nonetheless invested $300,000 in obtaining a state permit. 799 S.W.2d at 667. Consequently, the company had no "vested right" on the basis of its investment. *Id*.

In summary, a landowner who asserts a vested right to develop under a prior zoning ordinance must demonstrate good faith reliance on final prior government approval coupled with substantial expenditures or liabilities incurred that relate directly to construction.

## IX. CK DEVELOPMENT DOES NOT HAVE VESTED RIGHTS IN THE 2003 ROAD STANDARDS

The determinative question in this appeal is whether CK Development acquired a vested right in the road standards (2003 standards) that were in effect when the Concept Plan was approved in 2004 so that the city could not (in 2009) require CK to build roads in the unconstructed phases of the development in conformance with the new standards (2007 standards).

The trial court held CK Development "had vested rights significant enough to rely upon the original PUD plan approval that a change in the roads would jeopardize the project financially." We respectfully disagree.

### A. The Change in Road Standards Is Not a Zoning Change

All of the cases and treatises discussed above that address whether or not a developer has vested rights in an existing or former ordinance involve changes in zoning ordinances, not changes in building codes or similar regulations that do not pertain to uses of land. CK Development's arguments that it had vested rights in the prior road standards assume the

2007 Road Standards are a zoning change. As explained earlier in this opinion, however, we have concluded that the change in road standards is not an act of zoning because it does not substantially affect CK Development's use of the land for residences.

**B. CK Development Has Not Reasonably Relied on Any Final Governmental Action**

One of the requirements for establishing vested rights in a prior ordinance or regulation is a final governmental approval of development plans. In a majority of states, including Tennessee, that approval generally means a building permit. CK Development had not received final approval of Phase 7 or any building permits for the development of Phase 7 prior to the imposition of the 2007 Road Standards to that phase. CK Development's arguments implicitly equate approval of the Concept Plan and adoption of the PUD overlay as the equivalent of a building permit. However, the ordinance makes clear that they are not equivalents. CK Development was well aware that its initial approval of the Concept Plan for the PUD was conditional, subject to modifications, and required additional approval of specific plats. Accordingly, it could not have reasonably relied on prior governmental action in constructing roads in Phase 7.

First, the express language of Nolensville's Zoning Ordinance that permits CK Development to develop a PUD at all establishes there could have been no reasonable reliance in this situation. The express terms of Nolensville's Zoning Ordinance provide in pertinent part as follows:

> **Application for Approval of the Final PUD Plan.** After approval of the Concept Plan and any requested rezoning, the applicant shall apply for the final PUD plan approval. Failure to apply for approval of a final plan within one (1) year of approval of the Concept Plan shall result in the expiration of such approval. The Concept Plan or an amended plan may be re-submitted.

Zoning Ordinance §2.2.10.B.3. The BOMA approved the Concept Plan for the Bent Creek PUD in May 2004, and CK Development did not submit the final PUD plan for Phase 7 to the Planning Commission until September 2009, over five years later. Thus, the express terms of Nolensville's Zoning Ordinance provided that CK Development's Concept Plan for the Bent Creek PUD expired by the time CK Development submitted the final PUD plan for

Phase 7 to the Planning Commission.[4]  The Planning Commission could have treated the Phase 7 application as an application for a new PUD and required a new Concept Plan.  In any event, since the initial Concept Plan had expired, CK Development cannot rely on its approval as granting any vested rights.

Second, the PUD ordinance sets out the procedures for approval and makes it clear that approval of the Concept Plan is not a final approval that is equivalent to a building permit.  Rather, Section 2.2.10.B.4 of the Nolensville Zoning Ordinance gives the Planning Commission authority to amend the terms and conditions of the PUD and to amend the final PUD plan.  Additionally, the step-by-step procedure established in the ordinance for approval of final PUD plans also makes clear that the Concept Plan is preliminary and subject to changes and conditions.

Once the Planning Commission recommends approval of the Concept Plan to the BOMA, the BOMA has discretion to approve the Concept Plan, approve the request with conditions, or reject the Concept Plan.  Zoning Ordinance §2.2.10.B.1.d.  Once the BOMA approves the Concept Plan, the applicant is required to submit a final plan for the Planning Commission's consideration.  CK Development only submitted a final plan for Phase 7 during the proceeding now challenged.  If a PUD involves division of existing parcels, the applicant must also submit a preliminary subdivision plan for approval.  Zoning Ordinance §2.2.10.B.1.e.  By state law as well as ordinance, the Planning Commission has authority to approve such plans or plats.  Before a building permit can be issued for any construction to begin in any subdivision of the PUD, the Planning Commission must approve each final subdivision plan.  Zoning Ordinance §2.2.10.B.1.e.

State law gives authority to local planning commissions, not municipal legislative bodies, to adopt road standards for subdivisions and the concomitant necessary power to apply those standards.  Thus, CK Development should have been aware that the Planning Commission could adopt improved road standards.  It was aware that the Commission could amend or add conditions as part of its review and approval of final plans for a PUD and subdivision.  It was foreseeable that one of those conditions might be requiring compliance with road standards in effect at the time of review of the final plan or plat.

---

[4]Some states provide by statute that a developer has vested rights for a certain number of years against changes in zoning once it receives preliminary approval for its development.  *See, e.g., S.T.C. Corp. v. Planning Bd. Of Hillsborough Township*, 476 A.2d 888, 889 (N.J. Sup. Ct. App. Div. 1984) (developer was protected by law against zoning change for three years from date of preliminary site approval); Mich. Comp. Laws Ann. §560.120 (developer has vested rights for two years in conditions set forth in approved preliminary site plan).  Tennessee has not adopted such a statute.

The Planning Commission and the BOMA each approved CK Development's Concept Plan for the Bent Creek PUD with clearly spelled out conditions attached. The most important of these conditions was that the Nolensville Planning Commission could review the PUD at each phase and adjust the conditions of the Concept Plan as it deemed necessary. The Planning Commission's review of the PUD at Phase 7 and its decision that the roads must comply with the more recent Road Standards is consistent with both the Planning Commission's and the BOMA's conditional approval of the Concept Plan.

Additionally, during the progress of Bent Creek PUD, the Planning Commission amended and added conditions when approving prior phases. For example, in approving the final PUD plan for Phase 2 the Commission required the construction of a new road; for Phase 3, islands were removed from some areas; in Phase 4, a turn lane of specified width was required.

Consequently, we conclude that CK Development did not reasonably rely on any final government approval or other governmental action as establishing road standards that were not subject to modification for unbuilt phases of the PUD.

**C. CK Development Had Not Begun Substantial Construction on Phase 7 Or Incurred Substantial Liabilities Directly Related to Construction in Phase 7.**

CK Development agrees that the applicable standard for finding vested rights is whether an owner has obtained a permit to begin construction and spends considerable construction costs or incurs substantial liabilities in good faith reliance on the permit. CK Development explains that the doctrine of vested rights is based upon the concept of an owner's reliance on previously granted rights and the corresponding expenditure of substantial resources in developing those rights that benefit the whole property.

CK Development asserts it has vested rights in the 2003 Road Standards contained in the Concept Plan that was approved by the Planning Commission and the BOMA. As discussed earlier, however, we do not agree that CK Development reasonably relied on any final approval or other governmental action that would preclude changes in road standards with regard to Phase 7. The final plan for Phase 7 had not been approved, and CK Development knew such final approval was required.

Neither do we believe that CK Development has made substantial expenditures or incurred substantial liabilities directly related to construction in Phase 7. In fact, at the time

of submission of the final plan for Phase 7, there had been no construction in Phase 7 because required approvals had not yet been obtained.

Nonetheless, CK Development asserts that it has made such expenditures and incurred liabilities. However, the only expenditures and liabilities that can be described as "relating directly to construction," *Konigsberg*, 636 S.W.2d at 437, *Westchester Co., LLC,* 2005 WL 3487804, at *3, must necessarily relate to construction that occurred in prior phases of the Bent Creek PUD. In each of those phases, CK Development had obtained final approval of plans for that phase (with conditions) and, consequently, relied in good faith on that previously granted approval for those expenditures. Those approvals did not include roads in Phase 7.

CK Development's argument would have us treat expenditures and liabilities incurred in prior phases as the significant expenditures for Phase 7 that are required to establish vested rights to application of the prior road standards to the unbuilt roads in Phase 7. We decline to do so.

The trial court held CK Development "had vested rights significant enough to rely upon the original PUD plan approval that a change in the roads would jeopardize the project financially." In its ruling from the bench, the trial court explained:

> CK Development ...didn't just have pre-planning costs here. They have based their subdivision profitability upon the roads costing a certain amount to build, and the Court is very sympathetic to the fact that they've built out the subdivision with an eye on that cost, and now to change increases that cost and may, in fact, make the remainder of the lots unaffordable for the type of subdivision that's been built.
>
> . . .
>
> I do believe that in a final analysis of this case, [CK Development] does have vested rights significant enough to rely upon the original PUD plan's approval, that in his analysis of the cost of this subdivision, a change in the requirements for roads at this point would jeopardize the project as a whole, and that is more than what this Court believes is an appropriate action by the Planning Commission.

We cannot agree with the trial court's analysis based on profitability. Tennessee courts have clearly stated that lost profitability, or the potential of decreased profits, is not a substantial expenditure or liability related to construction. *Westchester Co., LLC,* 2005 WL 3487804, at *3-4. Consequently, CK Development cannot rely on a lost profit argument to demonstrate that it has a vested right in the 2003 Road Standards.

Our courts have also stated that expenses or liabilities incurred prior to final government approval, like a building permit, do not qualify for purposes of determining whether a vested right exists. *Robertson Co. v. Browning-Ferris Industries of Tennessee, Inc.*, 799 S.W.2d 662, 667 (Tenn. Ct. App. 1990) (denying vested right based on $300,000 in pre-permit, pre-construction costs); *Capps*, 2008 WL 5427972, at *11-12. All the construction on which CK Development relies took place before there was approval of the final plan for Phase 7.

Most of the cases and authorities dealing with vested rights involve a development that requires only one permit or final approval; *i.e.*, there is no concept approval and, later, approval of specific plans. In contrast, the case before us involves the application of "vested rights" principles to a multi-phase development where changes from the original Concept Plan are anticipated and procedurally addressed by ordinance.

In this case, the ordinance allowing planned unit developments is a multi-phase process and approval of the Concept Plan is only a beginning step. Final approvals are required for specific plans as the development progresses. The parties herein operated under that procedure and that understanding of the process for six years and through the approval of several phases. Accordingly, the PUD approval process in Nolensville is not a one-step process, and conditional approval of a Concept Plan does not guarantee further approvals. *See In re Appeal of Patricia Carroll*, 925 A.2d 990, 995 (Vt. 2007) (holding that village ordinance made clear that preliminary plat review was an intermediate step that does not give the developer any approval except the ability to request final plat review).

Essentially, CK Development asserts that the Bent Creek PUD should be treated as a single project and that once it started developing any portion of the PUD, it had a vested right to matters addressed in the original Concept Plan as approved. Consistent with that theory, CK Development argues that expenditures made in other phases of the development should be considered in the vested rights analysis.

CK Development relies on cases from other states. The first case is a 1961 decision from New York, *Telimar Homes v. Miller*, 218 N.Y.S.2d 175 (Sup. Ct. App. Div. 1961). The developer in that case purchased a tract of land to subdivide and develop for residential use. *Id*. at 176. When the developer purchased the land, the local zoning ordinance required the minimum building lot size to be a quarter acre. The developer divided the tract into four sections, and the planning board approved the map for the first section. *Id*. The developer then proceeded to develop the first section and simultaneously undertook the organization and construction of a water works project to accommodate all four sections of the tract of land. *Id*. at 176-77.

After the planning commission approved the second section for development, the zoning ordinance was amended to require the lots be a minimum of a half-acre rather than a quarter-acre, as before. *Id*. at 176. When the planning commission refused to approve the developer's maps for the third and fourth sections because they did not conform with the amended ordinance regarding minimum lot size, the developer filed a declaratory judgment action, claiming it had a vested right to a nonconforming use in the entire tract. *Id*. The court agreed with the developer. It said:

> It is clear from this record that the water system, roads, drainage system, model house construction and advertising were laid out and designed for the benefit of all four sections developed as a single, overall tract; that they would have been laid out and treated on an entirely different basis if the development of each section were to be separate; and that, prior to the zoning amendment, substantial construction had been commenced and substantial expenditures had been made in partial development of sections three and four, as well as sections one and two. Hence, plaintiff acquired a vested right to a nonconforming use as to the entire tract.

*Id.* at 177.[5]

In order to claim a similarity with the facts in *Telimar Homes*, CK Development argues it has constructed off-site road improvements that benefit the entire PUD. However, the record indicates that the off-site road improvements are limited to the realignment of two roads bordering the Bent Creek PUD and the termination of these roads where they formerly

[5]The other case CK Development relies on is from Illinois, *Village of Palatine v. LaSalle Nat'l Bank*, 445 N.E.2d 1277 (Ill. Ct. App. 1983), which we find distinguishable from the situation in the appeal before us.

intersected King Road. The purpose of this road realignment apparently was to limit the traffic congestion that would naturally result from the development of the Bent Creek PUD. The record suggests that these changes were made in an earlier phase to accommodate concerns of the city. There is no proof in the record that the city's concerns were related to the development of Phase 7. We do not believe this change in the roads constitutes an expenditure or liability related to the construction of Phase 7.

CK Development's final argument in support of its vested rights claim is that the roads it has constructed in Phase 1 and Phase 2 benefit Phase 7. While it is true that the roads in Phases 1 and 2 provide access to the lots in Phase 7, this does not mean that CK Development has engaged in "substantial construction" or incurred "substantial liabilities" relating directly to the development of Phase 7. There is no evidence the roads built as part of Phase 1 or Phase 2 would have been constructed any differently depending on whether they were going to provide access only to Phase 1 and Phase 2 or whether they were also going to provide access to lots in Phase 7. Neither the homes nor the roads located in Phase 1 and Phase 2 appear to be affected one way or the other by the development of Phase 7. Accordingly, we cannot conclude that the roads in existing phases of the PUD constitute substantial expenditures related to the construction of Phase 7.

Finally, it is important to remember that six years passed between approval of the initial Concept Plan and the submission of the final plan for Phase 7. In that time, there have been many steps in the process of developing Phases 1-6. CK Development had control of the timing of each phase. Undoubtedly, in these six years there were a number of changes related to the economy and other sources outside the city government that also may have affected the profitability of the development. Under CK Development's argument, it has a right to build roads in all future phases of the Bent Creek PUD to a standard the city has determined is not high enough to protect the interests of its citizens, even though the city will take responsibility for maintaining those roads. We do not think the city must accept and apply lower, earlier standards to roads yet to be approved or built in this PUD.

## X. CONCLUSION

CK Development did not acquire vested rights in the application of the 2003 Road Standards to roads to be built in phases of the development not yet approved. The modification of road standards was not a zoning change. Because the PUD ordinance sets out a clear approval process in which approval of a Concept Plan is only a preliminary step and final approvals must be obtained, CK Development did not reasonably rely on any governmental approval or action. Finally, CK Development did not incur significant

expenses or liabilities related to construction in Phase 7.

The trial court's decision that CK Development had vested rights in the 2003 Road Standards is hereby reversed. Costs of this appeal shall be taxed to CK Development, LLC, for which execution shall issue, if necessary.

 

 

 

_____
PATRICIA J. COTTRELL, JUDGE