IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 23, 2012 Session

## WASTE CONNECTIONS OF TENNESSEE, INC. v. THE METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY, TENNESSEE

**Appeal from the Chancery Court for Davidson County**
**No. 121040-II     Carol L. McCoy, Chancellor**

————————————

**No. M2012-02290-COA-R3-CV - March 27, 2013**

————————————

The dispositive issue in this land use appeal highlights important legal distinctions between when a local governmental body is functioning in a legislative capacity or an administrative capacity, and what can go wrong when the governmental body fails to conduct its meetings pursuant to the proper legal standards. When the local governmental body is enacting laws, such as zoning ordinances, it is functioning in a legislative capacity; however, when the governmental body is implementing existing zoning ordinances it is functioning as an administrative body or board. In this case the Council of the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro Council") was functioning as an administrative board, not in a legislative capacity, when it disapproved an application for the location of a waste transfer station located on property zoned "industrial restrictive." When the application was disapproved, the applicant filed a petition for common law writ of certiorari seeking to set aside the disapproval on the ground that it was illegal, arbitrary, fraudulent, and/or capricious because the Metro Council failed to comply with the requirements of Metropolitan Code § 17.40.280 by making a decision for the sole reason that local residents opposed the station, and not because the proposed use was "consistent or not consistent" with the requirements of Metro Code § 17.16. The trial court dismissed the petition and this appeal followed. Under the common law writ of certiorari standard, our review of the Metro Council's administrative decision is limited to determining whether the decision is clearly illegal, arbitrary, or capricious. An administrative decision that is not supported by substantial and material evidence is, by definition, arbitrary and capricious. This record is devoid of any substantial or material evidence to support the decision to disapprove the location for a waste transfer station; accordingly, the decision was arbitrary. We, therefore, reverse the trial court's dismissal of the common law petition for writ of certiorari and remand with instructions to set aside the Metro Council's disapproval of the location and to order that the application for a special exception be submitted to the Board of Zoning Appeals for its consideration pursuant to Metro Code § 17.40.280.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Nancy Vincent, Maia Tiffany Woodhouse, and V. Austin Shaver, Nashville, Tennessee, for the appellant, Waste Connections of Tennessee, Inc.

Lora Barkenbus Fox and Emily Herring Lamb, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County, Tennessee.

**OPINION**

This action arises from the disapproval by the Metropolitan Council of Nashville and Davidson County of an application for a special exception permit by Waste Connections of Tennessee, Inc., to locate a waste transfer station on property zoned "industrial restrictive." Waste Connections filed its application for a special exception permit on May 9, 2012, with the Metro Board of Zoning Appeals seeking to locate a waste transfer station at 1000 Apex Street, Nashville, Tennessee, located in Metropolitan Council District V. In its application, Waste Connections admitted that it did not meet three requirements found in Metropolitan Code of Nashville & Davidson County ("Metro Code") § 17.16.210.C., which states the requirements for waste transfer stations. Specifically, the location did not meet the street standard requirement that driveway access not be on a street bounded by a residential zoning district, the street standard requirement that traffic generated to and from the site use only streets where the existing level of service was a "D" and forecasted to remain at a "D," and the setback requirement that the waste transfer station be located a minimum of 150 feet away from any residential zoning district boundary. Waste Connections requested a variance as to each of these three requirements.

On May 10, 2012, Metro Council was notified of the application by the Zoning Administrator. A Resolution was introduced by Councilmember Scott Davis on June 15, 2012, to approve or disapprove the location of the proposed waste transfer station. The Resolution was considered by both the Public Works Committee and the Planning and Zoning Committee of the Council. A Metro Council meeting was held on July 3, 2012, at which time the Metro Council voted to disapprove the location.

Waste Connections then filed a petition for common law writ of certiorari seeking to set aside the disapproval of the Resolution by Metro Council on the ground that it was illegal, arbitrary, fraudulent, and/or capricious because the Metro Council failed to comply with the

requirements of Metro Code § 17.40.280 by making a decision for the sole reason that local residents opposed the station, and not because the proposed use was "consistent or not consistent" with the requirements of Metro Code § 17.16. On October 9, 2012, the trial court entered a Memorandum and Order dismissing the petition finding that Waste Connections's Application for a specific exemption constituted sufficient evidence in the record to support Metro Council's decision. The trial court also found that the Application was not for a special exception, but instead was for a variance specified in the zoning regulations. This appeal followed.

## ANALYSIS

Waste Connections contends the trial court erred in finding that Metro Council's disapproval of the location of a waste transfer station located at 1000 Apex Street was supported by substantial and material evidence. The basis of Waste Connections's argument is that Metro Council was functioning as an administrative board and its sole reason for disapproval of the location was the opposition by local residents, which Waste Connections contends is not an appropriate justification for disapproval under Metro Code § 17.40.280. Waste Connections further asserts that portions of the administrative record provided by Metro Council should not be considered as it was not presented to Metro Council at the meeting and, therefore, cannot constitute material evidence to support Metro Council's decision. Metro Council argues that there is sufficient evidence in the record to support Metro Council's disapproval of Waste Connections's Application.

### I. ADMINISTRATIVE DETERMINATIONS BY THE METRO COUNCIL

When the chief legislative body of a county acts under its police powers either to adopt or amend a zoning ordinance, it acts in a legislative capacity. *Fallin v. Knox County Bd. of Comm'rs,* 656 S.W.2d 338, 342 (Tenn. 1983). However, as this court has noted in numerous cases, when the chief legislative body of a county, such as Metro Council, reserves for itself administrative determinations that could have been assigned to the board of zoning appeals, the legislative body becomes an administrative board for purposes of the administrative determinations it reserved.[1] *McCallen v. City of Memphis*, 786 S.W.2d 633,

---

[1] As the *McCallen* court noted:

Municipal legislative bodies may reserve to themselves, where they do so by an ordinance containing a rule or standard to govern them, the power to grant or deny licenses or permits. This may be done in zoning matters, where it is not contrary to a state zoning or enabling act, and where the zoning ordinance likewise contains sufficient standards to govern the municipal council. Thus, a zoning ordinance vesting in the municipal council the power to

(continued...)

638-40 (Tenn. 1990); *see also Fallin*, 656 S.W.2d at 342; *Cost Enter. v. City of Lebanon*, No. M2008-006180-COA-R3-CV, 2009 WL 856643, at *4-5 (Tenn. Ct. App. Mar. 31, 2009); *Wadlyn Corp. v. City of Knoxville*, 296 S.W.3d 536, 542-43 (Tenn. Ct. App. 2008).

The test for determining whether the governmental action is legislative or administrative is whether it "makes new law or executes one already in existence." *State ex rel Moore & Assoc. v. West*, 246 S.W.3d 569, 575 (Tenn. Ct. App. 2005). As this court stated in *Mullins v. City of Knoxville*, 665 S.W.2d 393 (Tenn. Ct. App. 1983): "[The city council] exercised [a legislative] function in 1974 when it passed the [zoning] ordinance . . ."; however, referring to the city council's review of a planned unit development, the court stated: "[i]t is now exercising the administrative function of determining whether or not the plaintiff's planned development meets the standards of the ordinance." *Id.* at 395-96.

## II. APPLICATIONS FOR SPECIAL EXCEPTIONS

Pursuant to the zoning laws of this state, the Metropolitan Government has the authority to zone areas of Davidson County and to make special exceptions to that zoning when it is appropriate to do so under the zoning ordinance.[2] *Binkley v. Metro. Gov't of*

---

[1](...continued)
determine whether a building permit should be granted ... is regarded as administrative, rather than legislative in character.

*McCallen*, 786 S.W.2d at 640 (quoting 8 A E. McQuillin, *The Law of Municipal Corporations*, § 25.217, at 160-61 (3rd ed. 1986).

[2]See Barlow Burke Jr., Ann M. Burkhart, Richard H. Helmholz, *Fundamentals of Property Law* (Matthew Bender 3rd ed. 2010), for an excellent discussion of this and related zoning subjects. Chapter 7: Takings and Land Use Controls, Part II, Section (A)(5) explains:

The special exception is the third type of action available to change the permitted uses of land. The special exception differs in an important respect from the zoning amendment and the variance; the zoning ordinance specifies the permissible uses for which a special exception may be granted. For example, in a single-family residential zone, the zoning ordinance may specify that single-family homes and accessory uses, such as a detached garage, are permitted as a matter of right so long as they comply with other restrictions concerning required setbacks and similar matters. The ordinance then may specify uses that are permitted in that district if a special exception is granted. In a single-family residential zone, for example, special exception uses might include churches, community centers, and schools.

The types of uses that require a special exception are generally compatible with the uses
(continued...)

*Nashville*, No. M2010-02477-COA-R3-CV, 2011 WL 2174913, at *3 (Tenn. Ct. App. June 1, 2011). Acting pursuant to Tennessee Code Annotated § 13-7-206(a), the Metro Council created the Board of Zoning Appeals ("BZA") to handle this function, with the condition that for certain uses of land requiring a special exception, Metro Council retained the authority to approve or disapprove the location as a prerequisite to board action. *Id.* (citing Metro Code § 17.40.280). One such exception is the location of a waste transfer facility. Pursuant to the Metropolitan Code, as an additional level of administrative review, Metro Council must either approve or fail to disapprove, within 60 days, the location of a proposed waste transfer facility in order for the BZA to consider an application for a special exception.[3] *Id.* If Metro Council disapproves the location in a timely manner, the application for a special exception never goes to the BZA. *See* Metro Code § 17.40.280.

It is undisputed that Metro Council was not making "new law" when it voted on the Resolution to disapprove Waste Connections's location for a waste transfer station; instead, the Council was executing a zoning ordinance already in existence. Therefore, the Metro Council's decision to disapprove the location of Waste Connections's waste transfer station constituted an administrative determination. *See Moore*, 246 S.W.3d at 575 (citing *Weaver v. Knox Cnty. Bd. of Zoning Appeals*, 122 S.W.3d 781, 784 (784)).

III. STANDARD OF REVIEW

The standard of review of the Metro Council's administrative determinations under the common law writ of certiorari is limited to whether it exceeded its jurisdiction or acted illegally, arbitrarily, or fraudulently. *Binkley*, 2011 WL 2174913, at *1 (citing *McCallen*, 786

_____

[2](...continued)
permitted as a matter of right, but they may not be appropriate at every location in a district. For example, they may serve large numbers of people, such as a church or school, and therefore create potential traffic and noise problems. Special exception uses also may be generally desirable uses that have noxious qualities, such as a gas station. Therefore, rather than permit any landowner in a zoning district to use his property for such a use, the special exception review process permits an evaluation of the proposed location and method of operation of the use before it legally can be introduced into the neighborhood.

[3]Metro Code § 17.40.280 further states:

If the metropolitan council does not approve or disapprove the specific location, upon finding that the proposed use is consistent or not consistent with the conditions specified in Chapter 17.16, Article III, within sixty days of the date of notification by the zoning administrator to the council and the district councilmember that such an application has been filed, council approval shall be waived and the board of zoning appeals may proceed to consider the application.

S.W.2d at 638). Thus, it is the role of this court to examine whether Metro Council's decision to disapprove the resolution is clearly illegal, arbitrary, or capricious. A "decision that is not supported by substantial and material evidence is, by definition, arbitrary and capricious." *Outdoor Resorts at Gatlinburg, Inc. v. Utility Mgmt. Review Bd.*, No. E2011-01449-COA-R3-CV, 2012 WL 1267858, at *5 (Tenn. Ct. App. Apr. 13, 2012) (citing *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 110 (Tenn. Ct. App. 1993)).

## IV. CRITERIA TO BE CONSIDERED UNDER METRO CODE § 17.16

As we discussed in *Binkley*, Metro Council's duty under Metro Code § 17.40.280 is to approve or disapprove the "specific location of a . . . waste transfer facility" by determining whether the facility "is consistent or not consistent with the conditions specified in Chapter 17.16, Article III." *Binkley*, 2011 WL 2174913 at *4. Thus Metro Council may consider "any criteria within Chapter 17.16, Article III of the Metro Code that may apply to the location of a waste transfer facility." *Id.* In *Binkley*, we held that this language required the Council to consider both the specific criteria for waste transfer facilities found in Metro Code § 17.16.210(C) and the general criteria contained in § 17.16.150(A)-(J). *Binkley*, 2011 WL 2174913, at *4.

The specific criteria applicable to waste transfer facilities under § 17.16.210(C) are:

1. Lot Size. The minimum site area shall be ten acres.

2. Street Standard. Driveway access can be from any local street, provided that street is not bounded by any residential zoning district from the driveway access point to the street's intersection with a collector street or a street designated on the major street plan. A traffic impact study shall demonstrate that traffic generated to/from the site will only use streets where the existing level of service (LOS) is "D," and it is forecasted to remain at a LOS D or better with the proposed waste transfer traffic.

3. Setback. All buildings, structures, storage containers and areas, and vehicle loading/unloading areas shall be located a minimum of one hundred fifty feet away from any residential use, screening in the form of landscape buffer yard Standard D shall be applied. In addition, the entire facility shall be enclosed by a chain-link-type fence at least eight feet in height. The fence shall be patrolled each day to remove all windblown debris captured by the fence.

4. All loading, unloading, compacting, sorting, processing or storage shall take place within a completely enclosed building.

General criteria that may also be considered is set forth at Metro Code § 17.16.150(A)-(J). Two of these general criteria are the effect on other property in the area and compliance with other regulations. *See* Metro Code § 17.16.150(B) & (C).

Subsection (B) of Metro Code § 17.16.150 states:

Ordinance Compliance. The proposed use shall comply with all applicable regulations, including any specific standards for the proposed use set forth in this title, unless circumstances qualify the special exception for a variance in accordance with Chapter 17.40, Article VIII. Any accessory use to a special exception must receive express authorization from the board of zoning appeals.

Subsection (C) of Metro Code § 17.16.150 states:

Integrity of Adjacent Areas. A special exception use permit shall be granted provided that the board finds that the use is so designed, located and proposed to be operated that the public health, safety and welfare will be protected. The board shall determine from its review that adequate public facilities are available to accommodate the proposed use, and that the approval of the permit will not adversely affect other property in the area to the extent that it will impair the reasonable long-term use of those properties. The board may request a report from the metropolitan planning commission regarding long-range plans for land use development.

V. THE TRANSCRIPT OF THE JULY 3, 2012 MEETING OF METRO COUNCIL

Our review of the action of Metro Council in disapproving the Resolution is "from the transcription of the hearing before council." *McCallen*, 786 S.W.2d at 640-41. The transcript from the July 3, 2012 meeting of Metro Council demonstrates that there was no discussion of any substantive issue or criteria, only very brief comments. The transcript demonstrates that the Vice-Mayor announced the Resolution to approve the waste transfer facility and then asked for committee reports. Councilmember Hunt responded: "Public Works voted to disapprove, 10 for; zero against." Councilmember Claiborne reported: "Planning, Zoning and Historic Committee voted to disapprove; 12 for disapproval; 0 against." There was no statement or explanation as to the reasons for the committees' disapproval. Next, the sponsor of the Resolution, Councilmember Davis moved for disapproval and gave the following brief explanation for his vote:

This process been a lot – a lot of sweat, a lot of tears, and for some of the constituents, a lot of blood. And I say that because at the end of the day, we're all residents of Nashville, the greatest city in the United States, as far as I'm concerned. And right now I just wanted everyone to know that I'm moving for disapproval after several committee meet – community meetings and several other meetings in the district. It's overwhelmingly clear that the district does not want this. And I'm going to support the people in my district by asking the whole body, please vote for disapproval of this facility. Thank you. And I move for disapproval with a machine vote.

Following Councilmember Davis's statements, Councilmember Maynard spoke briefly about his reasons for supporting the approval of the waste transfer facility including his hope that transferring the currently abandoned property into a business would decrease the use of the property for illegal activities. Following Councilmember Maynard's statements, another councilmember moved for a vote and the Resolution was disapproved by Metro Council by a vote of 37 to 1.

As noted above, general criteria for consideration are set forth in Metro Code § 17.16.150(A)-(J) include, *inter alia*, the effect on other property in the adjacent area and compliance with other ordinances and regulations. *See* Metro Code § 17.16.150(B) & (C). The record before us reveals that none of these factors or criteria were presented to the Metro Council nor discussed prior to disapproving Waste Connections's proposed location. Furthermore, specific criteria to be considered pursuant to § 17.16.210(C) includes, lot size, street standards, setback from the street and adjoining property, and that all loading, unloading, compacting, sorting, processing or storage shall take place within a completely enclosed building. Again, like the general factors and criteria that were to be considered but were not, the record reveals that none of the specific criteria were presented to nor discussed by the Council prior to disapproving Waste Connections's location.

Not only were the factors and criteria not discussed, no materials or evidence were introduced into the record prior to the vote on the Resolution. In fact, Waste Connections's application for a special exception was not even introduced.

Waste Connections contends that the transcript as described above evidences that the sole justification for the Metro Council's vote was the opposition by district residents. Conversely, the Metropolitan Government points to the statements by the chairs of the Public Works committee and the Planning and Zoning committee acknowledging that both their committees voted unanimously to disapprove the request for the waste transfer facility. However, neither of the committee chairs articulated any factors, criteria, or reasons for

disapproval.[4] The Metropolitan Government further urges this court to look to the entirety of the administrative record, which, it contends, provides material evidence that supports disapproval of the Resolution. It also points to the Application, which requested variances for three of the requirements. We, however, find this inadequate for Metro Code § 17.16.150(B) provides that: "[t]he proposed use shall comply with all applicable regulations, including any specific standards for the proposed use set forth in this title, *unless circumstances qualify the special exception for a variance in accordance with Chapter 17.40, Article VIII*." (emphasis added). There was no discussion by the Metro Council regarding the requests for variances, moreover, the record does not support a finding that the Metro Council even considered the application. Thus, the record does not contain substantial or material evidence to support the administrative decision to disapprove the location.

Metro also argues that this action is no different from the case of *Binkley*, which also addressed an application for a waste transfer facility, and urges this court to reach the same result. However, in *Binkley*, this court found that Metro Council made its decision based upon two of the general criteria under Metro Code § 17.16.150(A)-(J) in disapproving the waste transfer facility. *Binkley*, 2011 WL 2174913, at *4. We specifically noted the statements of one councilmember concerning the proximity of the proposed waste transfer facility to a greenway, which the city had invested great sums of money to develop and maintain and concluded that this fell within the criteria set forth in Metro Code § 17.16.150(C), which addresses the integrity of adjacent areas to the waste transfer facilities and provides that "the public health, safety and welfare will be protected." *Id*. We also noted statements by a councilmember that the creation of the waste transfer facility would be in direct opposition to the Davidson County Region Solid Waste Plan, and that this consideration fell within the provision set forth at Metro Code § 17.16.150(B), which requires the proposed use to comply with all applicable regulations unless it qualifies for a variance. *Id*. Further, we found that these two considerations constituted substantial and material evidence that supported the Council's administrative decision. *Id*. at *5. Thus, we find this case distinguishable from *Binkley* because that record contained two well-articulated reasons for disapproving the location for waste transfer facility under considerations set forth in the general provisions at Metro Code § 17.16.150.

---

[4]A review of the transcript of the Planning, Zoning, and Historical Committee meeting reveals that the variance requests reflected in the application were a minimal consideration and the most persuasive consideration was the community objections. Waste Connections objects to the consideration of this arguing that the transcript is not part of the administrative record because it was not presented to the Metro Council.

Cases we find more similar include *Cost Enterprises v. City of Lebanon*, No. M2008-006180-COA-R3-CV, 2009 WL 856643 (Tenn. Ct. App. Mar. 31, 2009), in which Lebanon's City Council denied an application by a developer for a planned unit development based upon flooding and drainage issues. *Id*. at *5. The developer filed a petition for common law writ of certiorari contending that the city council's action was illegal, arbitrary or capricious. *Id*. at *4. The trial court reversed the council's denial of the application finding that the record was devoid of material evidence to support the council's decision. *Id*. at *1. In examining the record, this court looked to the council's discussion prior to the vote denying the PUD. *Id*. The city argued that material evidence supported the decision because an independent engineering firm confirmed that water runoff problems existed. *Id*. at *6. This court rejected that argument noting that while there was evidence of a current runoff problem, there was no evidence that the proposed development would make the runoff worse. *Id*. The city also pointed to the fact that the developer's expert could not state the problems would not become worse when the PUD was developed. *Id*. Upon examination of the expert's testimony during the council meeting, this court found that the testimony by the expert was that "better" or "worse" were subjective terms and this court found that such testimony did not constitute material evidence that supported a denial of the application under the ordinance. *Id*. Lastly, this court noted that the city council appeared to have held the developer to an "undefined, undisclosed and unanticipated standard." *Id*. at *7. The court noted that the city council "must apply the PUD standards that it has enacted in its ordinances." *Id*.

We also find it notable in *Cost Enteprises* that the City of Lebanon conceded that "fears of members of the community alone, in the absence of material evidence, will not support the denial of the application for approval of a PUD." *Id*. (citing *Sexton v. Anderson Cnty.*, 587 S.W.2d 663, 666 (Tenn. Ct. App. 1979)). In *Sexton v. Anderson Cnty.*, this court addressed the disapproval of a landfill by the Anderson County Board of Zoning Appeals. 587 S.W.2d at 664. In reviewing whether there was material evidence to support the denial, the court noted and rejected concerns by community members stating:

> Various members of the community expressed beliefs and opinions that the presence of the landfill would create noxious odors and result in falling property values; they also thought that trucks delivering refuse to the site of the fill would cause additional damage to the local roads. These statements were offered on the issue of whether the intended use is "potentially dangerous, noxious or offensive." None rises to the dignity of being material evidence on the issue. In each instance, the statements amount to an expression of opinion on the ultimate issue, unsubstantiated by factual premises. Speculations, expression of fears and considerations of an aesthetic or political nature do not form a basis to support a decision made by an administrative body charged

-10-

with adjudicatory responsibility. *Harvey v. Rhea County Beer Board*, 563 S.W.2d 790 (Tenn. 1978); *Ewin v. Richardson*, 399 S.W.2d 318 (Tenn. 1966).

*Id*. at 665-66.

In this case, the record reveals that Metro Council made its decision solely upon the concerns of the residents. We respect the Council's concerns for the residents who logically opposed the location of the waste transfer station and empathize with the residents. However, the Council is required by its own ordinances to make its decisions based upon the factors and criteria set forth in the Metro Code, in this case the criteria set forth in § 17.16.210 and § 17.16.150, and to provide an administrative record[5] that contains substantial and material evidence that supports its decision. This record contains neither. Accordingly, the decision by Metro Council to disapprove the location of the waste transfer station is not supported by substantial and material evidence; therefore, by definition, the decision to disapprove the location was arbitrary and capricious. *See Outdoor Resorts at Gatlinburg, Inc.*, 2012 WL 1267858, at *5 (citing *Jackson Mobilphone Co.*, 876 S.W.2d at 110).

We, therefore, reverse the trial court's dismissal of the common law petition for writ of certiorari and remand with instructions to vacate the Metro Council's administrative decision disapproving the location proposed by Waste Connections. Having vacated the disapproval of the location, we refer back to Metro Code § 17.40.280, which specifies what happens when the Council approves the location or fails to disapprove the location within sixty days. Metro Code § 17.40.280 states:

If the metropolitan council does not approve or disapprove the specific location, upon finding that the proposed use is consistent or not consistent with the conditions specified in Chapter 17.16, Article III, within sixty days of the date of notification by the zoning administrator to the council and the district councilmember that such an application has been filed, council approval shall be waived and the board of zoning appeals may proceed to consider the application.

---

[5]In addition to filing with the trial court a verbatim transcript of the Council's consideration of the Resolution on July 3, 2012, the Metropolitan Government filed with the trial court numerous documents and emails that are identified as "the administrative record" of the Council's consideration of the location for the waste transfer station. The transcript of the Council's administrative hearing, however, reveals that with the exception of emails from residents opposing the location, the other documents contained in the so-called administrative record were not presented to the Council for its consideration. Because the Metro Council did not consider the so-called administrative record during the July 3, 2012, administrative proceeding, we may not either.

As a result of our ruling in this appeal, the Metro Council did not validly disapprove the specific location within sixty days of the date of notification by the zoning administrator to the council and the district councilmember that such an application had been filed. As a result, approval by the Metro Council has been waived and the Board of Zoning Appeals may proceed to consider the application. *See* Metro Code § 17.40.280.

Therefore, the application by Waste Connections for a special exception shall be submitted to the Board of Zoning Appeals for its consideration pursuant to Metro Code § 17.40.280.

### IN CONCLUSION

The judgment of the trial court is reversed, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the Metropolitan Government of Nashville & Davidson County.

_____
FRANK G. CLEMENT, JR., JUDGE