**J.T. McCALLEN, Trustee, d/b/a Winchester Square Townhouses, Wooddale Church of Christ, Wooddale Condominiums, Townhouse Village, Winchester Condominiums, and Cromwell Park Joint Venture, d/b/a Cromwell Park Apartments, Plaintiffs/Appellees,**

v.

**CITY OF MEMPHIS, Tennessee, the Memphis City Council, Sam P. Gay, Jr., Waymon H. Welch, Jr., and Homer B. Branan, III, Defendants/Appellants.**

Supreme Court of Tennessee,
at Jackson.

March 5, 1990.

Clifford D. Pierce, Jr., City Atty., Monice M. Hagler, Asst. City Atty., City of Memphis, Henry H. Hancock, Rebecca P. Tuttle, Memphis, for defendants/appellants.

Carl H. Langschmidt, Jr., Boone, Wellford, Clark, Langschmidt & Apperson, Memphis, for plaintiffs/appellees.

## OPINION

GARY R. WADE, Special Judge.

Permission to appeal to this court has been granted to the defendants, City of Memphis, Tennessee, the Memphis City Council, Sam P. Gay, Jr., Waymon H. Welch, Jr., and Homer B. Branan, III, under Rule 11 of the Tennessee Rules of Appellate Procedure. There are two issues:

1. Whether the proper method of review of a resolution of the Memphis City Council giving approval to a planned development is certiorari or declaratory judgment.

2. Whether the Court of Appeals erred in its application of the scope of review.

We initially hold that the action of the city council giving approval to the plan was administrative rather than legislative in nature; any challenge of the action is by writ of certiorari. Secondly, both the trial court and the Court of Appeals failed to give proper deference to the determination of the Memphis City Council. We reverse the action of both the trial court and the Court of Appeals and enter a judgment in favor of the defendants. Costs are adjudged against the plaintiffs.

A complaint for declaratory judgment was filed by the plaintiffs/appellees, J.T. McCallen, Trustee, doing business as Winchester Square Townhouses, Wooddale Church of Christ, Wooddale Condominiums, Townhouse Village Winchester Condomin-iums, and Cromwell Park Joint Venture doing business as Cromwell Park Apartments. The City of Memphis, its city council, the record owner of the property, the developer, and the developer's representative are defendants/appellants. As owners of the property surrounding the 1.8 acre tract of the defendant developers, the plaintiffs sought to invalidate a resolution by the council which gave approval to the planned development. The record of the hearing before the Memphis City Council was certified to the Chancery Court of Shelby County. After reviewing the written proceedings, the chancellor, citing an unreported case decided by the Western Section of the Court of Appeals, held that the council's action was invalid as "not supported by substantial evidence." The intermediate court affirmed, holding that there was no rational basis for the enactment of the resolution which authorized the planned development.

A planned development is authorized by § 14 of the Memphis and Shelby County Zoning Ordinance. The purpose of this section is as follows:

> The primary thrust of development in the Memphis–Shelby County area has taken place under the requirements of Uniform Regulations within each zoning district that may on occasion prevent or discourage innovative site design and development that will respond to new market demands. The use of improved techniques for land development is often difficult under traditional zoning regulations designed to control single buildings on individual lots. *Proper private development* of congested and blighted areas within the City of Memphis, together with advantageous development of larger areas of substantially vacant land in the county, *require a flexible approach to be available both to the city and the county and to the landowner.* Deviations from the rigid uniformity characteristic of such earlier zoning regulations and *the use of new and innovative techniques are henceforth to be encouraged as a matter of public policy.* The *city and county may,* upon proper applica-

tion, *grant a permit for a planned development for a site of any size within the city* or for parcels of at least three acres in an unincorporated area of Shelby County to facilitate the use of flexible techniques of land development and site design, *by providing relief from zone requirements designed for conventional developments, and may maintain standards and procedures for the issuance of a special use permit for planned developments* in order to obtain one or more of the following objectives:

1. Environmental design in the development of land that is of higher quality than is possible under the regulations otherwise applicable to the property.

2. Diversification in the uses permitted and variation in the relationship of uses, structures, open space and height of structures in developments intended as cohesive, unified projects.

3. Functional and beneficial uses of open space areas.

4. Preservation of natural features of a development site.

5. Creation of a safe and desirable living environment for residential areas characterized by unified building and site development program.

6. Rational and economic development in relation to public services.

7. Efficient and effective traffic circulation, both within and adjacent to the development site.

8. Creation of a variety of housing compatible with surrounding neighborhoods to provide a greater choice of types of environment and living units.

9. Revitalization of established commercial centers of integrated design in order to encourage the rehabilitation of such centers in order to meet current market preferences.

10. Provision in attractive and appropriate locations for business and manufacturing uses in well-designed buildings and provision of opportunities for employment closer to residents with a reduction in travel time from home to work.

The general standards and criteria for the planned development are as follows:

The *legislative body may grant a permit which modifies the applicable district zoning regulations* and subdivision regulations upon written findings and recommendations by the Land Use Control Board which shall be forwarded pursuant to the provisions contained in this section. (Emphasis added.)

The ordinance provides that planned developments are permitted in all zoning districts, irrespective of the specific zoning classification of the property. In return, the developer must comply with specific standards and procedures over and above projects designed in areas for which the intended use is permitted by the applicable zoning designation.

The resolution approving the planned development allows for exceptions from any zoning district regulations governing "use, density, area, bulk, parking, signage, and subdivision regulations" as are necessary to achieve the objectives of the development; any exceptions must, however, be consistent with certain standards and criteria contained within the ordinance. Modifications of the zoning district requirements are not permitted if the proposal would create any of the following circumstances:

(1) inadequate or unsafe access to the planned development;

(2) traffic volume exceeding the anticipated capacity of the proposed major street network in the vicinity;

(3) an undue burden on public parks, recreation areas, schools, fire and police protection, and other public facilities which serve or are proposed to serve the planned unit development; and

(4) the development which will be incompatible with the purposes of this ordinance.

The ordinance goes on to provide that the legislative body may consider and ultimately grant the permit for the planned development upon the written recommendations by the Land Use Control Board. The general standards and criteria which must be met before the council may approve the

planned development are set out in Section C of the governing ordinance:

1. The proposed development will not unduly injure or damage the use, value, and enjoyment of surrounding property nor unduly hinder or prevent the development of surrounding property in accordance with the current development policies and plans of the city and county.

2. An approved water supply, community waste water treatment and disposal, and storm water drainage facilities that are adequate to serve the proposed development have been or shall be provided.

3. The location and arrangement of the structures, parking areas, walks, lighting, and other service facilities shall be compatible with the surrounding land uses, and any part of the proposed development not used for structures, parking and loading areas or access ways shall be landscaped or otherwise improved except where natural features are such as to justify preservation.

4. Any modification of the zoning or other regulations that would otherwise be applicable to the site are warranted by the design of the outlined plan and the amenities incorporated therein, and are not inconsistent with the public interest.

5. Homeowners associations or some other responsible party shall be required to maintain any and all common open space and/or common elements.

Section E of the ordinance provides for commercial or industrial uses in planned developments:

*A permit* for a planned commercial or industrial development *may be issued by the legislative body for buildings* or premises *to be used for* the retail sale of merchandise and services, parking areas, office buildings, hotels and motels, and similar *facilities ordinarily accepted as commercial center uses* and those industrial uses which can reasonably be expected to function in a compatible manner with the other permitted uses in the area.... (Emphasis added.)

Planned commercial and industrial developments, in addition to the other standards and criteria set forth in the Memphis ordinance, are subjected to additional requirements: screening or buffers, when the commercial development abuts a residential district; restrictions on the display and storage of merchandise materials to enclosed buildings or completely screened open areas (it is notable that this section of the ordinance permits an exception for the sale of gasoline from pumps outside of a structure); suitable accessibility (designed to discourage outside through traffic); and other landscaping to provide for natural screening and noise reduction.

Waymon H. Welch, Jr., made application for a commercial planned development upon a vacant 1.8 acre of real estate located on the corner of Winchester and Outland Roads in Memphis. The development was proposed in an area classified as a multiple dwelling residential zone and generally surrounded by townhouse type condominiums and churches.

The staff of the Memphis and Shelby County Office of Planning and Development reported that the 1973 planning district's study recommended predominantly residential use for the property. The report noted that the development was divided into two lots: one, consisting of .7 acre, planned a 3,000 square foot 7-11 convenience store; the second, consisting of 1.1 acre, planned an L-shaped 15,000 square foot retail commercial building. The staff recommended rejection because commercial uses were not compatible with the general area. It determined that the development presented a visual intrusion upon the residential streetscape and that there was adequate, existing commercial property within 1,000 feet to the south, 1,500 feet to the west, and 3,000 feet to the east.

The Land Use Control Board disagreed with the conclusions of its staff and, after a public hearing in November of 1986, recommended approval to the Memphis City Council by a 5-4 vote. The majority determined that the plan submitted by the defendant Welch was compatible with the townhouse and multi-family development in the area.

The defendant Welch contracted to purchase the subject property from the defen-

dant Gay. The original application planned an 18,000 square foot building on the subject. During the staff review procedure, the plan was amended to reduce the floor space to 16,300 square feet; increase the building setback on Outland Road; and provide for more landscaping, screening, and open space. The developer changed the number of parking spaces from 62 to 57; increased the amount of the property devoted to internal landscaping from 18% to 29% on one of the lots and 6.9% to 31% on the other. Internal landscaping on the amended plan was increased from 8,222 square feet to 24,271 square feet. The building setback from Outland Road was extended from 55 feet to 80 feet to align with the existing Winchester Square Townhouse structures. The plan specifically excluded pawn shops, drive-in restaurants, taverns, cocktail lounges, night clubs, used goods, second hand sales, a car wash, and veterinary clinic.

In the proceedings before the city council, the Land Use Control Board provided its favorable recommendation; staff reiterated its opposition based upon surrounding property usage being primarily residential. The staff also noted that some 130 signatures had been collected by those in opposition to the planned project. Based upon the assumption that the council might, despite objections, approve the application, the staff suggested that the plan be altered in certain respects in order to assure optimum compatibility with the existing uses in the area.

Facts presented by the developer in support of the approval were that 873 families lived in apartments, condominiums, or single family dwellings within 1,500 feet (a generally accepted maximum walking distance) of the proposed development. A petition of 73 residents in the area, many of whom also signed a petition against the project, was filed as representative of those favoring the planned development.

While acknowledging an initial hesitation in providing support to the planned convenience market, certain residents expressed the belief that the development would be an asset to the community. Particular

commendation was given to a detailed landscaping design.

Traffic studies established that Winchester Road had an average daily flow of 31,000, a considerable number of vehicles for an area primarily residential in nature. Petitions were submitted on behalf of the developer indicating that the 7–11 Market had been, at its prior location, a compatible use with neighboring residents. A president of a nearby homeowners association, who initially had reservations about the location of a convenience store in his neighborhood, stated that after a three year experience, he had determined that the convenience store was compatible with the adjoining residential use. The defendant Branan, representing the developer, described "convenience shopping [as] almost a necessity for the surrounding area." Other evidence suggested that the subject 1.8 acre tract was impractical for residential use, economically and otherwise.

It was established that a similar planned development only 3,000 feet from this location had been approved by the city council in an area zoned for multi-family residential use. The staff also opposed that application. Proponents of the project asserted that the property was comparable. They claimed that the land's highest and best use was as a convenience commercial center, that the proposal made good use of the property, and that the improvements would be a service to the surrounding community.

A spokesperson for those in opposition to the project indicated that many of the photographs submitted to the city council of similar areas in Memphis already had commercial uses, appropriately zoned, before apartments were built on adjoining property. He stated that multi-family dwellings near this particular site had been the established land use in the area for 20 years and that the proposed development would "unduly injure or damage the use, value and enjoyment of surrounding property." While the opponent acknowledged that the proposed location would be a better place to have a convenience store than its existing location on the west side of Winchester

Road, only a small distance away, he argued that the only justification for the relocation would be to "make some money for the landowner and the developer."

Other opponents suggested that round-the-clock operations, lighting, and beer service were not compatible with the high density, residential character of the neighborhood. Some asserted that traffic and congestion in the area would increase even more, that vandalism might become a problem, and that surrounding property values would decrease. One opponent represented that 61 of those initially favoring the project had asked that their support be withdrawn.

The members of the council debated the issue. A variety of opinions were expressed on the record. Some felt the land use would increase the value of the surrounding property; others thought it would be decreased. By a vote of seven to four, the council ultimately approved the amended plan of development:

> WHEREAS, the Council of the City of Memphis has reviewed the recommendation of the Land Use Control Board, the report and recommendation of the Office of Planning and Development; and,
> WHEREAS, the Council of the City of Memphis has held a public hearing on the planned development and has determined that the planned development meets the objectives, standards and criteria for a planned development, and said development is consistent with the public interests.
> NOW, THEREFORE, BE IT RESOLVED ... that the planned development is hereby granted....

After the filing of the complaint for declaratory judgment, responsive pleadings, and argument of counsel, the trial judge determined that the resolution of the Memphis City Council was not supported by substantial evidence and should be declared invalid. In its one page order, the court purported to follow the guidelines set out in *Ray, et al v. Dattel, et al,* Tennessee Court of Appeals, Western Section, August 2, 1985, a case of declaratory judgment. The chancellor heard no new evidence and rendered his decision based upon the transcript of the hearing before the Memphis City Council.

In upholding the ruling, the Court of Appeals gave particular emphasis to subsection C(1) which requires that development "will not unduly injure or damage the use, value and enjoyment of surrounding property."

## I

Common law certiorari is provided for in Tenn.Code Ann. § 27–8–101:

> The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy.

Review under the common law writ is limited to whether "the inferior board or tribunal (1) has exceeded its jurisdiction, or (2) has acted illegally, arbitrarily, or fraudulently." *Hoover Motor Exp. Co. v. Railroad and Public Utilities Commission,* 195 Tenn. 593, 604, 261 S.W.2d 233, 238 (1953). *See* also *Boyce v. Williams,* 215 Tenn. 704, 389 S.W.2d 272 (1965); *Yokley v. State,* 632 S.W.2d 123 (Tenn.App.1981). By contrast, statutory certiorari is set forth in Tenn.Code Ann. § 27–8–102. Review under the statutory writ is by trial *de novo. See Roberts v. Brown,* 43 Tenn.App. 567, 586–90, 310 S.W.2d 197, 206–08 (1957).

In the case of *Fallin v. Knox County Board of Commissioners,* 656 S.W.2d 338 (Tenn.1983), this court considered the alternative procedures available for the judicial review of actions taken by either county or municipal authorities. The threshold question was whether the inferior tribunal, board or officer exercised a legislative or an administrative function. The term administrative is used interchangeably with judicial or quasi-judicial. *Id.* at 341. *See Nance v. Council of City of Memphis,* 672 S.W.2d 208, 211 (Tenn.App.1983). *See* 8A E. McQuillin, *The Law of Municipal Corporations,* § 25.230, at 191 (3rd ed. 1986) (hereinafter McQuillin).

In *Fallin,* the county legislative body amended its comprehensive zoning ordinance to change the classification of a specific tract from single-family to multi-family residential. The plaintiff challenged the legislation and sought review by common law writ of certiorari. This court held that "an action for declaratory judgment, as provided by Tenn.Code Ann. §§ 29–14–101 —29–14–113, rather than a petition for certiorari is the proper remedy to be employed by one who seeks to invalidate an ordinance, resolution or other [local governmental] legislative action ... enacting or amending zoning legislation." *Id.* at 342. (Rule 57 of the Rules of Civil Procedure governs the action for declaratory relief and includes the right to jury).

This court further held as follows:

We wish to point out, however, that the *remedy of certiorari provided by Tenn. Code Ann. §§ 27–8–101, 27–9–101—27-9–113, will continue to be the proper remedy* for one who seeks to overturn the determination of a Board of Zoning Appeals as provided by Tenn.Code Ann. § 13–7–106, *et seq.,* and Tenn.Code Ann. § 13–7–205, *et seq.* This distinction in remedies is made *because the determinations made by a Board of Zoning Appeals are administrative determinations, judicial or quasi-judicial in nature, and are accompanied by a record of the evidence* produced and the proceedings had in a particular case, whereas, the enactment of ordinances or resolutions, creating or amending zoning regulations, is a legislative, rather than an administrative, action and is not ordinarily accompanied by a record of evidence, as in the case of an administrative hearing. (Emphasis added.)

656 S.W.2d at 342.

Significantly, the court referred to the common law writ of certiorari, not the statutory writ, as the appropriate review procedure of determinations of the board of zoning appeals. Decisions of that body are classified as administrative.

 Our analysis, in this instance, of the resolution of the Memphis City Council leads us to the conclusion that the action was administrative rather than legislative. While zoning ordinances and their amendments are clearly legislative acts and subject to attack by a complaint for declaratory judgment, a crucial test in distinguishing legislative from administrative acts is whether the action taken (resolution or ordinance) makes new law or executes one already in existence. McQuillin, § 10.06 at 995. This treatise further provides as follows:

Municipal legislative bodies may reserve to themselves, where they do so by an ordinance containing a rule or standard to govern them, the power to grant or deny licenses or permits. This may be done in zoning matters, where it is not contrary to a state zoning or enabling act, and where the zoning ordinance likewise contains sufficient standards to govern the municipal council. Thus, a zoning ordinance vesting in the municipal council the power to determine whether a building permit should be granted ... is regarded as administrative, rather than legislative in character.

McQuillin, § 25.217 at 160–61.

While an argument nonetheless exists that the reservation by a local governmental legislative body to grant permits for zoning purposes is tantamount to a legislative act of rezoning, the overriding issue is whether the enabling ordinance provides sufficient standards to preclude the exercise of unbridled discretion. In order to qualify as an administrative, judicial, or quasi-judicial act, the discretionary authority of the government body must be exercised within existing standards and guidelines.

Section 14 of the Memphis and Shelby County zoning ordinance provides relief from zoning requirements designed for more conventional development only when a planned development meets the standards of the pre-existing ordinance. These criteria, in our view, are sufficient to require administrative adherence. The action of the Memphis City Council pursuant to these pre-established guidelines requires the exercise of reasonable discretion. Consequently, any review should be through

common law certiorari, as prescribed in *Fallin,* from the transcription of the hearing before council.

In *Mullins v. City of Knoxville,* 665 S.W.2d 393 (Tenn.App.1983), the Court of Appeals also held that the review of a planned unit development by the city council was administrative rather than legislative:

> It exercised [a legislative] function in 1974 when it passed the ordinance. It is now exercising the administrative function of determining whether or not the plaintiff's planned development meets the standards of the ordinance.

*Id.* at 396.

In this case, the chancellor considered no evidence other than that produced in the hearing before the Memphis City Council. *See* Tenn.Code Ann. § 29–14–108; Tenn.R. Civ.P. 57. Although the complaint was incorrectly designated as a suit for declaratory judgment, the trial court's procedural treatment of the case was consistent with that provided through common law writ of certiorari. *Fallin* permitted the application for certiorari to be treated as a declaratory judgment. 656 S.W.2d at 342. This rationale applies equally well in the reverse. We therefore treat the complaint of the plaintiffs as a petition for a common law writ of certiorari.

## II

When the act of a local governmental body is legislative, judicial review is limited to "whether any rational basis exists for the legislative action and, if the issue is fairly debatable, it must be permitted to stand as valid legislation." *Keeton v. City of Gatlinburg,* 684 S.W.2d 97, 98 (Tenn. App.1984). In general, courts of all jurisdictions have interpreted the fairly debatable standard as requiring considerable deference to the decision of the governmental authority:

> [E]very intendment is to be made in favor of the [re] zoning [decision] and the matter [is] largely in the discretion of the municipality authorities.

*Episcopal Foundation of Jefferson City v. Williams,* 281 Ala. 363, 202 So.2d 726, 729 (1967).

The restricted role of the courts in reviewing the validity of a zoning ordinance or other legislative acts of a municipality was described in *Fallin* as follows:

> In enacting or amending zoning legislation, the local authorities are vested with broad discretion and, *in cases where the validity of a zoning ordinance is fairly debatable, the court cannot substitute its judgment* for that of the legislative authority. If there is *a rational or justifiable basis* for the enactment and it does not violate any state statute or positive constitutional guaranty, the wisdom of the zoning regulation is a matter exclusively for legislative determination.
>
> In accordance with these principles, it has been stated that the *court should not interfere* with the exercise of the zoning power and hold the zoning enactment invalid, unless the enactment, in whole or in relation to any particular property, is shown to be clearly arbitrary, capricious, or unreasonable, having no substantial relationship to the public health, safety, or welfare, or plainly contrary to the zoning laws. (Emphasis added.)

*Id.* at 342–343.

The ultimate consideration in *Fallin* was "whether any possible reason can be conceived to justify the instant ordinance." Its conclusion was that the legislative action was "fairly debatable" and not prohibited as a "spot zone." *See* 656 S.W.2d at 343–44.

█ The scope of judicial review under common law writ of certiorari, on substantive as opposed to procedural issues, is hardly distinguishable from the standard set out in *Fallin.* The courts must determine whether the action of the city council in the exercise of its administrative, judicial or quasi-judicial function was illegal or in excess of jurisdiction. Tenn.Code Ann. § 27–8–101. If the exercise of authority by the governmental body can be classified as arbitrary or capricious, courts have routinely provided relief:

[An] abuse of discretion means action that is in opposition to the intent and policy of the statute and of the ordinance adopted conformably to its provisions, as applied to the facts and circumstances of the case.

McQuillin, § 25.310 at 562; *See* 261 S.W.2d at 238.

Abuse of discretion, arbitrariness, capriciousness, and unreasonableness are terms often used interchangeably. *Id.*

■ Under either the "illegal, arbitrary and capricious" standard of review for administrative acts or the "fairly debatable, rational basis, any possible reason" review of legislative acts, it is apparent that the circumstances of this case do not warrant the invalidation of the act of the Memphis City Council. There was evidence that the proposed planned development was compatible with the uses in the area. The Land Use Control Board approved the application. The city council had earlier approved another application for a commercial planned development on a property on Winchester Road located 3,000 feet to the east of the subject area. The surrounding development was for multi-family use. The city council made a factual determination that the defendants had met the pre-established guidelines for planned developments. The plaintiffs presented an excellent challenge to the plan; there was evidence upon which the council could have denied the application, yet its favorable ruling can hardly be deemed arbitrary.

If the resolution had been legislative rather than administrative, these facts establish that the issue was fairly debatable and that a rational basis existed for approval. It is hard to imagine a more difficult undertaking than that to overcome the "any possible reason" standard. Our courts must review the legislative acts of local governments deferentially. The division of power into separate branches is constitutionally founded. Art. 2, § 1, Tenn. Const. The policy of judicial intrusion is embodied in the *Fallin* opinion:

Zoning is a legislative matter and, as a general proposition, the *exercise of the zoning powers should not be subject to judicial interference unless clearly necessary.* (Emphasis added.)

*Fallin,* 656 S.W.2d 338 (Tenn.1983) (quoting 82 Am.Jur.2d *Zoning and Planning* § 338 at 913–14 (1976)).

■ The "fairly debatable, rational basis," as applied to legislative acts, and the "illegal, arbitrary and capricious" standard relative to administrative acts are essentially the same. In either instance, the court's primary resolve is to refrain from substituting its judgment for that of the local governmental body. An action will be invalidated only if it constitutes an abuse of discretion. If "any possible reason" exists justifying the action, it will be upheld. Both legislative and administrative decisions are presumed to be valid and a heavy burden of proof rests upon the shoulders of the party who challenges the action.

If there was ever any basis for the distinction in the application of the substantive law to legislative and administrative actions, it has dissipated with the passage of time. Our consideration of the authorities on the subjects suggest little difference:

Judicial review of administrative determinations ... is limited in scope. The ... extent of a judicial review ... is narrow. As a general rule [local governmental bodies are] clothed with broad discretionary powers, the decision ... will not be disturbed or set aside by a reviewing court unless [it] is arbitrary, or capricious, [an abuse of discretion, or clearly erroneous].

82 Am.Jur.2d, *Zoning and Planning,* § 334 at 906.

The "fairly debatable rule" has in various jurisdictions been applied to both administrative and legislative actions. It is likewise apparent that the "illegal, arbitrary and capricious rule" has been applied in each instance.

■ While this court recognizes the statutory, procedural distinction between common law certiorari and declaratory judgment, there is no sound logic to maintain different standards of substantive review. Whether the action by the local governmen-

tal body is legislative or administrative in nature, the court should refrain from substituting its judgment for the broad discretionary authority of the local governmental body. An invalidation of the action should take place only when the decision is clearly illegal, arbitrary, or capricious.

The trial court and the Court of Appeals are reversed; judgment is entered in favor of the defendants. Costs are adjudged against the plaintiffs.

DROWOTA, C.J., and COOPER, HARBISON and O'BRIEN, JJ., concur.