IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 9, 2016 Session


**CHARLES BENSON, ET AL. v. KNOX COUNTY, ET AL.**


**Appeal from the Circuit Court for Knox County**
**No. 219214, 119414, 39014     William T Ailor, Judge**

_____


**No. E2015-01357-COA-R3-CV**
**FILED-MAY 12, 2016**

_____


This appeal arises from a zoning and land use dispute.  The defendants applied to rezone most of the property at issue from Agricultural to Planned-Residential and sought approval of a development plan for a multi-dwelling project consisting of 312 apartment units.  They also requested a Use-Permitted-on-Review approval for a marina on a portion of the property that would remain zoned as Agricultural.  At issue before us are three separate actions taken by Knox County legislative and administrative bodies in relation to the requests, specifically: (A) the County Commission's rezoning of the property from Agricultural to Planned-Residential at 1to 5 dwelling units per acre; (B) the Board of Zoning Appeals' approval of the development plan for 312 apartment units; and (C) the Board of Zoning Appeals' denial of the marina proposal.  The trial court upheld the actions. We affirm.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J. delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Wayne Alan Kline, Knoxville, Tennessee, for the appellants, Charles E. Benson, Rebecca Benson, Charles W. Benson, Mary Benson, Frank Gambuzza, Belinda Gambuzza, Cheryl Hatcher, Dennis Hatcher, Mark Jackson, Kathy Jackson, Glen Loy, Mark Smothers, Virginia Smothers, Michael Whitaker, Sherry Whitaker, Jack Woodall, and Sharon

Boyce.

Alexander Oaks Waters, Daniel A. Sanders, John K. King, and R. Louis Crossley, Jr., Knoxville, Tennessee, for the appellees, Knox County, Tennessee, Board of Zoning Appeals of Knox County, Huber Properties, LLC, Clear Water Partners, LLC, and Gloria A. Melgaard Trust.


**OPINION**

**I. BACKGROUND**

This lawsuit, a consolidation of three separate cases, arises from a zoning and land use dispute regarding property comprising approximately 112 acres located within Knox County along the northeast and southwest sides of Emory Church Road and I-140, north of Henderson Lane in Knoxville, Tennessee ("the Property"). Many years ago, the Property, zoned Agricultural and Floodway, was a single farm. The Property, which has a single parcel number - 114018 - is naturally divided east to west by Fort Loudoun Lake, and much of the old farm land now lies beneath the water. Construction of the Pellissippi Parkway further affected the Property.

Knox County's Southwest Sector, in which the Property is located, is considered "the fastest growing of the twelve planning sectors in Knox County." The record reveals that between 1995 and 2005, one-quarter of all new subdivision lots within the twelve planning sectors in the county were located in this sector. The Planned Growth areas within the Southwest Sector are "intended to accommodate suburban growth," the "expansion of the Knox County economy," and to "meet other land development needs." A goal of the Knoxville-Knox County Metropolitan Planning Commission ("MPC"), which exists to provide a consistent approach to zoning in the area, is to "[i]dentify locations for multi-family housing including apartments and condominiums" within the Southwest Sector.

The record before us reflects that within a 1.5 mile radius of the Property, there are 31 parcels zoned Planned-Residential ("PR") with densities ranging from 2.5 dwelling units per acre to 12 dwelling units per acre. At least four developments within the area are currently zoned PR with a density of five dwelling units per acre. Several parcels abutting the Property at issue are zoned PR with maximum densities ranging from three to five dwelling units per acre. One adjoining parcel contains a four-story building. Several parcels contain three or four-story apartment complexes.

In view of the Property's location within the Planned Growth portion of the Southwest Sector and given that the Property is surrounded by suburban low density

- 2 -

development, the defendants, Huber Properties, LLC and Clear Water Partners, LLC, along with the Gloria A. Melgaard Trust (hereafter referred to collectively as "Developers"), applied to the MPC to rezone most of the Property from Agricultural to PR and sought approval of a development plan for a multi-dwelling development on the Property of 312 apartment units ("Development Plan"). Developers requested PR with a density of up to five dwelling units per acre, as such a classification is considered "low density" in Planned Growth areas. They also sought a Use-Permitted-on-Review approval for a marina on a portion of the Property that would remain zoned as Agricultural ("Marina Proposal").

Developers requested PR zoning for approximately 101.266 acres. Of the acres requested for PR zoning, 31.2 acres are below the 820' Contour (i.e., the high water mark for Fort Loudoun Lake) and 2.96 acres are included within the area that was proposed for a marina. The MPC staff subtracted the 31.2 acres below the 820' Contour and the 2.96 acres in the Marina Proposal to find a total of 66.67 acres subject to development.

The Knox County Zoning Ordinance ("Zoning Ordinance") permits "[m]ulti-dwelling structures and developments" to be constructed on property that is zoned PR, but requires MPC approval of such a plan before construction can begin. In this matter, Developers submitted the Development Plan for the apartment development simultaneously with the rezoning request.

## The Development Plan

The Development Plan includes a total of thirteen buildings. To minimize the environmental impact, it utilizes the clustering approach to maximize the use of the density on the flatter portions of the Property. Only two sections of the Property will contain apartment buildings. Four buildings, housing 72 apartment units, will be located on a section of the Property east of Pellissippi Parkway and west of Emory Church Road. Two of the buildings in this section will be two stories and two buildings will be two stories on one side and three stories on the down-hill side. Nine buildings, housing 240 apartment units, will be located on the section of the Property east of Emory Church Road. Six of the buildings will be three stories on one side and four stories on the down-hill side and the remaining three buildings will be three stories.

Developers took steps to increase compatibility with the surrounding landowners. Despite the required minimum setback for PR zoned property being 35 feet, Developers intentionally increased the setbacks such that the minimum distance between any adjoining structures is at least 150 feet, and over 250 feet in certain areas. They hired a certified arborist to evaluate the height of the trees in the buffer zone and conservation easement to ensure the apartment buildings will not be above the tree line in the line of sight from neighboring properties. In addition, a detailed traffic impact study was

performed, and Developers committed "to spend over $400,000 on an already failing intersection" that will help to address current and future traffic problems, "even with the new traffic load . . . ." The Knox County Department of Engineering and Public Works reviewed the study, and the Department's Director of Planning and Development concurred in the findings. She opined that the roadway improvements "address current concerns and mitigate adequately the increased volume that will be created." Appraisals of the impact of the Development Plan provided evidence that the proposed use of the Property will not injure the value of nearby properties.

## MPC Review

Based on the "Density and Land Disturbance Guidelines," the MPC staff calculated a base density of 2.58 dwelling units per acre for the 66.67 developable acres of the Property. The planning guideline used by the MPC provided for "a density bonus of up to 10 percent of the total units allowed . . . when a conservation easement is placed on an undisturbed steep hillside or ridgetop" and an "additional bonus density of 10 percent of that allowed by the base density . . . when public access, such as a trail easement, is provided within the conservation easement." The MPC staff report on the rezoning application required Developers to dedicate "[a]t least a portion of the area west of Pellissippi Parkway" and "[a] portion of the areas dedicated as conservation easements" to be given over for public access. The Development Plan revealed "approximately 17.4 acres to remain undisturbed and placed in conservation easements." Based on the conservation easements and public access included within the Development Plan, the planning guideline suggested a 20 percent density bonus above the base density of 2.58 dwelling units per acre, which brought the density up to 3.09 dwelling units per acre for the 66.67 acres subject to development.

Ultimately, the MPC staff recommended that the Property be rezoned to PR with a total density of up to five dwelling units per acre, based on the planning criteria, the proposed conservation efforts in the Development Plan, and the following locational criteria:

> The site is located within a half mile from the major interchange of Pellissippi Parkway and Westland Drive corridor linking Anderson, Knox, and Blount Counties.

> The site is adjacent to and has easy access to Pellissippi Parkway, which is a major regional transportation corridor linking Anderson, Knox, and Blount Counties.

> The site is surrounded by suburban low density residential

- 4 -

development at zoning densities of up to 5 dwelling units per acre.

The site is separated from lower density development by a railroad right-of-way to the north and portions of Fort Loudoun Lake to the east and west. To the south are two large parcels that are zoned planned residential at densities ranging from 3 to 5 dwelling units per acre.

The site is located in such a way that it has lake frontage, as well as higher elevation areas that could offer mountain views, increasing the desire for greater density development. Also, if the accompanying Use-Permitted-on-Review development plan (9-B-13-UR) is approved, the proposed apartments would be located next to a marina.

The availability of public water and sanitary sewage on the Property also factored into the MPC recommendation.

Based on the recommended density, the MPC multiplied the 66.67 developable acres by the allowable density of 5 dwelling units per acre and determined 333 total units would be appropriate for the Property.

In the review by the MPC, staff concluded that the "apartment development is consistent with all relevant requirements of the PR . . . zoning districts, as well as other criteria for approval of a Use on Review." They also determined that the Development Plan is consistent with the adopted plans and policies of the Knoxville-Knox County General Plan 2033 ("General Plan") and Southwest Sector Plan. On November 14, 2013, after hours of debate, the MPC voted 14 to 1 to recommend that the County Commission approve PR zoning of the Property at a density of 1 to 5 dwelling units per acre. The MPC also voted 13 to 2 to approve the Development Plan for "a multi-dwelling development with up to 312 apartment units subject to the 20 conditions."


**The General Plan**


The General Plan, which was written by the MPC and adopted by the MPC, the County Commission, and the Knoxville City Council in 2003, "outlines a long-range vision and policy framework for physical and economic development" in Knoxville and Knox County. Envisioned by the plan is "[i]ncreased density and a mix of housing types" in Knox County. It provides that "[n]eighborhoods should be developed to provide a variety of housing choices." It also recognizes that "[m]ore density should be

allowed in exchange for amenities such as quality landscaping and open space."

According to the General Plan, clustered housing preserves open space by concentrating development onto certain portions of a parcel, rather than spreading it evenly over the tract. The total number of units allowable in a clustered development is calculated by multiplying the number of permitted units per acre by the total number of acres; then, the allowable residential units are transferred from the total developable area and concentrated into the areas most suitable for construction. In the view of Knox County, clustering should be encouraged because it "can conserve natural features and reduce stormwater runoff" as well as "prevent[] residential sprawl and help[] to preserve the agrarian roots of Knox County."

According to the Executive Director of the MPC at the time this Development Plan was presented, the General Plan, containing "ten major ideas" and 129 general Development Policies, is "advisory in intent." The General Plan expressly states that it is "a policy framework for making day-to-day decisions about the timing, location, character and extent of development." The Executive Director stressed that the Development Policies "are not rules."

## The Southwest Sector Plan

Several other official plans, including sector plans, are incorporated into the General Plan. The Southwest Sector plan is the one applicable to the Property at issue. It was adopted by the MPC, the County Commission, and the Knoxville City Council in 2005. Before drafting the Southwest Sector Plan, the MPC held a series of public workshops "to identify what residents feel should be accomplished with future planning and development." One concern was to "[i]dentify locations for multi-family housing including apartments and condominiums" within the Southwest Sector. According to the Southwest Sector Plan, certain areas - Lyon's Bend, Toole's Bend, Keller Bend and southern Choto - are to maintain their rural residential character. However, no property within a 1.5 mile radius of the Property at issue is thus identified. The plan also recognizes that "low-density land zoned planned residential at up to five units per acre has developed with a mix of detached, attached condo and multi-family apartment uses" and that the "overall density for these properties is still considered low density." The Southwest Sector Plan designates certain parcels within the sector as "Planned Growth areas," which are "intended to accommodate suburban growth . . . and other land development needs." The Property at issue is located within the Planned Growth area.

## Actions By County Commission/Board of Zoning Appeals

On December 16, 2013, the County Commission took up the MPC recommendation for rezoning the property to low density PR zone with a density of up to five dwelling units per acre. After debate on the issue, the County Commission voted six to five to rezone the Property from Agricultural to PR at one to five dwelling units per acre, consistent with the MPC's recommendation. Property owners in the area of the development ("the Opposition" or "Concerned Residents") appealed the MPC's approval of the Development Plan to the Board of Zoning Appeals ("BZA"), maintaining the total number of dwelling units that can be placed on the Property, by their calculation, is 172. On February 26, 2014, after two lengthy hearings, the BZA voted to affirm the MPC's approval of the multi-dwelling development.


## Marina Proposal

The Zoning Ordinance allows marinas to be constructed on property that is zoned Agricultural, but requires MPC approval of a Use-Permitted-on-Review application before construction can begin. Simultaneous with the filing of the rezoning application and Development Plan, Developers submitted an application for the required Use-Permitted-on-Review approval of the marina to be "located on the west and east side of Emory Church Road on the north side of a cove on Fort Loudoun Lake." At the November 14, 2013, MPC meeting, Developers announced a modification that removed the portion on the east side of Emory Church Road. The Marina Proposal included six boat ramps with three boarding docks, 75 covered dock slips located on the north and south side of the cove, and 141 dry storage stalls (91 covered) on the west side of Emory Church Road. A marina office and restrooms were to be located near the entrance on the west side. No immediate neighbors were to be adjacent to the proposed marina site.

Upon review, the MPC staff found "the proposed marina . . . consistent with all relevant requirements of the PR and A zoning districts, as well as other criteria for approval of a Use-Permitted-on-Review." A written recommendation that the MPC "APPROVE the development plan for a marina with up to 75 dock slips and 233 dry storage stalls" was issued. On November 14, 2013, the MPC voted 13 to 2 to approve the Marina Proposal. However, the Opposition appealed the MPC's ruling on the Marina Proposal to the BZA, which overruled the MPC approval on February 26, 2014.

Ultimately, three lawsuits were filed. Concerned Citizens filed suit challenging the County Commission's approval of rezoning to PR at a density of one to five dwelling units per acre (Case No. 3-90-14). Developers filed suit challenging the BZA's denial of the Use-Permitted-on-Review for the Marina (Case No. 1-194-14). The Opposition filed suit challenging the BZA's approval of Developers' Development Plan to build up to 312

apartments on the Property (Case No. 2-192-14). All the actions were consolidated for trial. After a bench trial was held on November 13, 2014, the court issued an order on June 16, 2015, upholding the County Commission's rezoning of the Property, the BZA's approval of the Development Plan, and the denial of the Marina Proposal. The Opposition filed a timely appeal.

## II. ISSUES

The issues raised in this appeal are restated as follows:

1. Whether the County Commission and the BZA complied with state law.

2. Whether the actions of the County Commission in rezoning the Property and the BZA in approving the Development Plan were appropriate.

3. Whether the BZA's decision regarding the marina was supported by material evidence.

## III. STANDARD OF REVIEW

Our review of the trial court's decision is de novo upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Southern Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

An action for declaratory judgment under Tennessee Code Annotated section 29-14-101 to 29-14-113, rather than a petition for certiorari, "is the proper remedy to be employed by one who seeks to invalidate an ordinance, resolution or other legislative action" of an authority enacting or amending zoning legislation. *Fallin v. Knox Cnty. Bd. Of Comm'rs*, 656 S.W.2d 338, 342 (Tenn. 1983) (quoting 82 Am. Jur. 2d Zoning and Planning § 338 (1976) at 913-14). Accordingly, in regard to the challenge of the County Commission's rezoning decision, the trial court was required to apply the "any reasonable basis" or "fairly-debatable" standard, which is the appropriate standard for an amendment to a "comprehensive zoning ordinance to change the classification of a specific tract." *McCallen v. City of Memphis*, 786 S.W.2d 633, at 639-40 (Tenn. 1990). Under this standard, "if the issue is fairly debatable, it must be permitted to stand as valid

legislation." *Id.* at 640.

The appropriate review procedure for the determinations of the BZA is the common law writ of certiorari. *McCallen*, 786 S.W.2d at 639. The common law writ of certiorari is an order from a superior court to a lower tribunal or board to send up the record for review. *Utley v. Rose*, 55 S.W.3d 559, 563 (Tenn. Ct. App. 2001). Review is generally limited to the record made before the lower tribunal or board. *421 Corp. v. Metro. Gov't of Nashville & Davidson Cnty.*, 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000). Judicial review under the common law writ is limited to whether the tribunal or board exceeded its jurisdiction; followed an unlawful procedure; acted illegally, arbitrarily, or fraudulently; or acted without material evidence to support its decision. *Harding Academy v. Metro. Gov't of Nashville & Davidson Cnty.*, 222 S.W.3d 359, 363 (Tenn. 2007). "[M]aterial evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992). A "decision that is not supported by substantial and material evidence is, by definition, arbitrary and capricious." *Outdoor Resorts at Gatlinburg, Inc. v. Utility Mgmt.Review Bd.*, No. E2011-01449-COA-R3-CV, 2012 WL 1267858, at *5 (Tenn. Ct. App. Apr. 13, 2012) (citing *Jackson Mobilphone Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 106, 110 (Tenn. Ct. App. 1993)).

The court must refrain from substituting its judgment for that of the local governmental body." *McCallen*, 786 S.W.2d at 641. The interpretation of a zoning ordinance is a matter for local officials. *Hoover v. Metro. Bd. of Zoning Appeals of Davidson Cnty.*, 955 S.W.2d 52, 54 (Tenn. Ct. App. 1997). Both the County Commission's rezoning of the Property and the BZA's approval of the Development Plan are presumed to be valid. *See McCallen*, 786 S.W.2d at 641.

## IV. DISCUSSION

The Opposition contends that the County Commission and the BZA failed to comply with Tennessee Code Annotated section 13-3-304 when the Property was rezoned to PR at one to five dwelling units per acre and the Development Plan was approved. Tennessee Code Annotated section 13-3-304 provides that

> [i]f the legislative body adopts [a] general regional plan in the form of an ordinance by the municipality or a resolution by the county, then any land use decisions thereafter made by the legislative body, planning commission or board of zoning appeals . . . must be consistent with the general regional plan.

Tenn. Code Ann. § 13-3-304(b). Concerned Citizens assert that Knox County's decisions

in this case were inconsistent with the General Plan and, therefore, in violation of Tennessee Code Annotated section 13-3-304. They rely on a portion of Development Policy 11.2 in support of their contention that actions inconsistent with the General Plan have been taken:

> The density for residential development will be based upon the amount of usable acreage, ***excluding areas which are under water, in floodways, have steep slopes, or are otherwise undevelopable***. Rural, planned growth and urban growth boundaries also influence density. These areas are designated in the Knoxville-Knox County Farragut Growth Policy Plan. The following general standards will be applied in setting densities for residential development, providing these densities do not conflict with other policies in this plan:
>
> * * *
>
> • Low-density 1 to 5 du/ac[1] in planned growth areas.
>
> • Medium density 6 to 12 du/ac in planned growth and urban growth areas; appropriate along collector or arterial roads, waterfronts, and as buffer zones between lower density residential and more intense uses.

The Opposition asserts that the 66.67 acres in the Development Plan includes 17.6 acres without access to a public road and about 31 acres with steep slopes. They contend only 18.07 acres are developable and properly considered in the calculation of density.


**Access to Public Road**


Concerned Citizens cite Knox County Zoning Ordinance § 3.40.02 ("No building shall be erected on a lot which does not have access to a public road, as prescribed in the Knoxville-Knox County Minimum Subdivision Regulations."). The portion of the Property at issue is the part located to the west of Pellissippi Parkway and to the south of Fort Loudoun Lake. The Opposition contends road access to this property cannot be reasonably obtained. They assert the options to access the parcel given by Developers are pure speculation and cannot occur without incurring unreasonable costs. They further opine that Developers may not cross the park land, which is subject to a federal restriction precluding its use for any purpose other than recreation.

---

[1] Dwelling units per acre.

Developers contend the applicable plans or zoning regulations do not define property without current access to a public road as "undevelopable" property, and zoning officials have never considered property without current access to a public road to be "undevelopable." They argue such property is developable because access to a public road can be obtained on any piece of property in Tennessee through a private condemnation process provided by statute. Further, they assert that because the southern portion and the northern portion west of Pellissippi Parkway share a parcel number, the entire parcel has access to a public road.

At the November 14, 2013, MPC meeting, the Executive Director stated that "[t]o declare [the parcel] undevelopable at this time is way premature." He asserted that Developers "could get an easement through other people's property. They could buy a piece of property. They could get an easement from Knox County parks. There are any number of ways to access that parcel in the future." At the December 16, 2013, County Commission meeting, the Executive Director noted that "with regard to the 17 plus acres on the west side of Pellissippi, to define that as undevelopable I think is wrong, in my opinion." He noted that "[t]here are any number of ways where access to the entire part of that property can be achieved, including easements through the interstate below the bridge or below the roadway, a bridge across the water, the purchase of property elsewhere to make a link to the public road elsewhere."

Steve Wise, attorney for the MPC, stated at the November 14, 2013, MPC meeting that "[t]he inclusion of the 17 acres is utterly appropriate." He provided that, "[t]here is a statutory scheme available for a property that otherwise doesn't have access to a public road they can compel access to a public road . . . . It is just the cost of development. Sometimes you don't have access; you just have to go take it." At the February 26, 2014, meeting of the BZA, Mr. Wise noted that "to say that it's undevelopable is just not correct legally. It's not correct factually, and it was utterly appropriate for this acreage to be employed in the calculation of the acreage, in calculation of the density." He stated that "it would be inappropriate not to include it. . . . [I]f there's a desire to improve it . . . they will carve out an easement, either across the park land or across the adjoining subdivision."

The courts construe ordinances, rules, and regulations utilizing the same principles used to construe statutes. *See City of Knoxville v. Brown*, 260 S.W.2d 264, 267 (Tenn. 1953). Words are given their natural and ordinary meaning unless the provision requires otherwise. *See Boles v. City of Chattanooga*, 892 S.W.2d 416, 420 (Tenn. Ct. App. 1994). As noted in *Whittemore v. Brentwood Planning Commission*, 835 S.W.2d 11, 16 (Tenn. Ct. App. 1992), the meaning of an ordinance and its application to a particular circumstance are, in the first instance, questions for the local officials to decide. Further "any ambiguity in a zoning ordinance should be resolved in favor of an owner's

unrestricted use of his or her property." *Id.* at 15.

In view of the fact that Tennessee Code Annotated section 54-14-101 gives any owner of landlocked property the absolute right to condemn access to a public road through neighboring property, Knox County's treatment of the parcel as "developable" property for the purposes of calculating density was reasonable and consistent with the General Plan. The trial court properly found the interpretations of the zoning officials to be reasonable and did not err in holding that the inclusion of the parcel in the density calculation was consistent with the General Plan. Accordingly, the County Commission and BZA complied with Tennessee Code Annotated section 13-3-304 on the road access issue.

## Sloped Property

The Opposition further argues that the County Commission and BZA acted inconsistently with the General Plan by allowing a density of up to five dwelling units per acre on portions of the Property with slopes greater than 15 percent. They contend the actions of the County Commission and BZA depend on viewing this land as if it were everywhere flat, accessible, and buildable. Concerned Citizens argue the density permitted depends on transferring development from usable acreage, not unusable acreage. According to the Opposition, only 172 units at the most can be developed under the density guidelines. They rely on a single Development Policy ("Development Policy 7.6") from the General Plan which states, "[r]estrict development on slopes greater than 15% and along streams and rivers. Housing densities on 15-25% slopes: 2 dwelling units per acre. Housing density on slopes greater than 25%: 1 dwelling unit per 2 acres." The Opposition asserts that every Knox County land use and zoning decision must strictly comply with the density recommendations in Development Policy 7.6.

The Hillside and Ridgetop Protection Plan ("HRPP") amendment to the General Plan is similar to Development Policy 7.6 and reflects that it is advisory and nonbinding. In low density areas, the HRPP recommends a density of: 5 dwelling units per acre on property containing slopes of 15 percent or less, 2 dwelling units per acre on property containing slopes between 15 and 25 percent, and .5 dwelling units per acre on property containing slopes between 25 and 40 percent. When the County Commission adopted the HRPP as an amendment to the General Plan, it inserted a paragraph providing:

> This plan and the principles, objectives, policies and guidelines included herein *are advisory in nature and constitute non-binding recommendations for consideration in connection with development of steeply sloped areas*. While this plan is being adopted as an amendment to the

> Knoxville-Knox County General Plan 2033, it is intended to provide background and supplemental information of an advisory nature and serve as a guide to future MPC staff recommendations, but it is not intended to form an official part of the General Plan which would be binding on future land use decisions by County Commission, MPC, the County Board of Zoning Appeals pursuant to T.C.A. § 13-3-304. ***Any comparable provisions of the Knoxville-Knox County General Plan 2033 or any Sector Plan which relate to hillside and ridgetop protection shall also be considered advisory consistent with this plan***.

(Emphasis added.).

The HRPP amendment clearly states that it relates to "any comparable provisions of the Knoxville-Knox County General Plan 2033 or any Sector Plan which relate to hillside and ridgetop protection." The provisions that pertain to "hillside and ridgetop protection" include the portions of the General Plan and Sector Plans that concern development of steeply sloped areas, evidenced by the fact that the "Hillside and Ridgetop Protection Plan" expressly provides that it "sets forth the vision and primary means to be used to safely develop[] steep slopes and ridgetops . . . ." Clearly, the HRPP amendment states that "comparable" provisions in the General Plan are also advisory. The density recommendations for sloped areas in Development Policy 7.6 are identical to the recommendations found in the HRPP amendment. We find that the County Commission's resolution adopting the HRPP amendment was procedurally sufficient to amend the General Plan. Tenn. Code Ann. § 13-3-304(b)(l). Therefore, pursuant to the HRPP amendment, Development Policy 7.6 of the General Plan must be viewed as advisory and non-binding.

Even if we found the HRPP amendment to be ineffective, the record before us reveals the local zoning officials have always interpreted and applied the density recommendations from Development Policy 7.6 and the other provisions of the General Plan and Southwest Sector Plan as advisory and nonbinding. Both prior to and subsequent to the adoption of the HRPP amendment to the General Plan, the MPC recommended, and the County Commission approved, rezoning decisions that allowed densities in sloped areas that exceeded the recommendations in Development Policy 7.6. These prior interpretations and applications of Development Policy 7.6 as non-binding and advisory must be afforded "great significance" by the courts. *See Whittemore v. Brentwood Planning Comm'n*, 835 S.W.2d at 16. "The meaning of a zoning ordinance and its application to a particular circumstance are, in the first instance, questions for the local zoning officials to decide. Thus, the courts attach great significance to the local officials' prior interpretations of an ordinance . . . ." *Id.*

- 13 -

The Development Plan in this case proposes to conserve the sloped areas and limit construction to the flatter portions of the Property such that approximately 50.5% of the PR zoned property will remain undisturbed. Not only does the Development Plan propose to conserve large portions of the Property, it proposes to provide public access to undisturbed acreage through greenway easements. By conserving the sloped property and providing public access, the Development Plan directly advances several Development Policies from the General Plan.

The actions taken by the County Commission and the BZA in relation to the sloped areas of the Property were carefully considered and consistent with the applicable plans and state law. Accordingly, the trial court properly affirmed the decisions of the County Commission and the BZA and found their rulings did not violate Tennessee Code Annotated section 13-3-304.

## Development Plan

Concerned Citizens also argue that the BZA's approval of the Development Plan was inconsistent with the Zoning Ordinance. According to the Opposition, by approving the Development Plan, the BZA failed to properly weigh or apply certain "general standards" that are to be used by zoning officials when considering the location and appropriateness of uses permitted on review under Article 4, Section 10 of the Zoning Ordinance. They contend that the development is not compatible with the character of the neighborhood where it is proposed or with the size and locations of buildings in the vicinity. They assert that nothing in the Zoning Ordinance would allow it to be ignored to "curb urban sprawl" and that no language in the Ordinance increases or allows increase in density in a PR zone because of location near a transportation corridor.

Developers observe the Zoning Ordinance requires approval of a development plan for a multi-dwelling development in the PR zone before construction can begin. Within the PR zone, there are two types of uses that can be considered by zoning officials: Permitted Uses and Uses-Permitted-on-Review. "Multi-dwelling structures and developments" are described as Permitted Uses in Section 5.13.02. Multi-dwelling structures and developments are not described in Section 5.13.03 Uses-Permitted-on-Review. Accordingly, a multi-dwelling structure, such as the ones sought in the Development Plan, is a Permitted Use within the PR zone, and not a Use-on-Review. Section 5.13.15 of the Zoning Ordinance deals with the procedure for approval of a multi-dwelling development plan in the PR zone:

> No building permit shall be issued for development of any property within a PR, Planned Residential Zone until a written application for the review and approval of the

development plan has been filed with the Planning Commission. . . . Said application shall be made in conformity with Section 6.50 . . . .

Section 6.50 deals with both development plans for Permitted Uses and Uses-Permitted-on-Review. Thus, the "general standards" contained in Sections 4.10.14 through 4.10.19 and relied upon by the Opposition do not apply to the approval of the Development Plan under the facts of this case because the proposed multi-dwelling development is a "Permitted Use" and not a "Use-Permitted-on-Review" under Article 5 of the Zoning Ordinance. Developers contend, however, the Development Plan at issue does comply with all of the standards listed in Article 4, Section 10.

The record before this court reveals Developers worked extensively with the MPC staff to comply with the General Plan and the Southwest Sector Plan. The Development Plan has been through multiple levels of review and been approved in its entirety at every level. First, the Development Plan was carefully reviewed over a 60-day period by the MPC staff. A report was issued recommending that the MPC "APPROVE the development plan for a . . . multi-dwelling development with up to 312 apartment units," subject to certain conditions. The MPC staff stated that "[t]he proposal is consistent with the adopted plans and policies of the General Plan and Sector Plan" and in "harmony with the general purpose and intent of the Zoning Ordinance." The MPC then considered the Development Plan and the recommendation and voted to approve the Development Plan for "a multi-dwelling development with up to 312 apartment units subject to the 20 conditions." Following the Opposition's appeal of the approval, the BZA considered the Development Plan at length during two separate hearings on January 22, 2014, and February 26, 2014. Prior to and during the BZA hearings on the Development Plan, Developers submitted expert opinions, reports, and oral testimony from geologists, arborists, appraisers, hydrologists, traffic engineers, civil engineers, biologists, land planners, surveyors, and architects. The BZA voted to affirm the MPC's approval of the multi-dwelling development. Further, the trial court found no error in the BZA's approval of the Development Plan. Based on the material evidence presented to the BZA it had sufficient grounds and substantial bases to approve the Development Plan as being consistent with the General Plan and Southwest Sector Plan.

While various members of the community expressed their opinions that the Development Plan is inappropriate for the area, no material evidence has been presented to defeat the proposal of Developers. Speculations, expression of fears, and considerations of aesthetic matters do not form a sufficient basis to countermand the determinations made by Knox County. Because the Property at issue is entirely within a planned growth area, and located along both a collector road and the waterfront, the density increases were properly approved. The decision of the BZA was not arbitrary. "The decision of a local board will only be considered arbitrary when it is determined

that the record contains no evidence to support the decision." *Wills v. City of Memphis*, 457 S.W.3d 30, 39 (Tenn. Ct. App. 2014). Likewise, the action of the County Commission to rezone the Property was reasonable.

## Marina

The Zoning Ordinance provides that a Use-Permitted-on-Review may be approved only when the use "is reasonably necessary for the convenience and welfare of the community" and may be denied where the above cannot be shown or "where it can be shown that approval would have an adverse impact on the character of the neighborhood in which the site is located." The record before us supports the determinations by the BZA and the trial court that the use of a portion of the Property for a marina is not reasonably necessary for the convenience and welfare of the community.

## V. CONCLUSION

The trial court correctly affirmed the County Commission's rezoning of the Property and the BZA's approval of the Development Plan and denial of the marina proposal. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are assessed to the appellants, Charles E. Benson, Rebecca Benson, Charles W. Benson, Mary Benson, Frank Gambuzza, Belinda Gambuzza, Cheryl Hatcher, Dennis Hatcher, Mark Jackson, Kathy Jackson, Glen Loy, Mark Smothers, Virginia Smothers, Michael Whitaker, Sherry Whitaker, Jack Woodall, and Sharon Boyce.

_____
JOHN W. MCCLARTY, JUDGE